Hodgson et al. *v.* Bigelow, Appellant.

498

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Argued April 24, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles E. Kenworthey,* for appellant.

*William C. Ferguson, Jr.,* for appellees.

OPINION BY MR. JUSTICE MAXEY, July 5, 1939:

This is a suit for damages, the claim being based on defendant's alleged malpractice.

On May 26, 1936, when the minor appellee was eight years and seven months old, he fell on a stick which penetrated his thigh five inches. His wound was treated by Dr. Bigelow, the appellant, who described it as "entirely sub-cutaneous . . . not deep" and "just under the skin." He treated it in the following manner: after being cleaned externally with alcohol, it was "swabbed all the way to the bottom" with a swab soaked in alcohol and it was also swabbed with tincture of iodine. He then placed in the wound a loose gauze drain which had been soaked with alcohol and he then applied a sterile dressing. On three succeeding days he repeated the treatment. During this course of treatment the condition of the wound impressed the physician as "very satisfactory." He detected "no signs of the onset of any infection of any serious nature." On the fifth day after the injury, the physician did not see the boy. On the sixth day, the latter was brought to the physician's office and the same treatment as previously given was administered. On that occasion the doctor was told by the boy's stepfather that the child had complained about his jaws hurting him or being stiff." Upon examining the boy, the doctor described the condition of his jaws and mouth as "perfectly normal." He found "no rigidity of his neck muscles." At 3 a. m. of the following day the doctor was summoned to the boy's home and he found him to be suffering with "definite stiffness of the masseter muscle and some of his neck." The boy was immediately taken to the Jefferson Hospital. There, after Dr. Fry saw the child in the defendant's presence, the latter left the hospital and never again saw the boy professionally. Dr. Shallow, whose assistant Dr. Fry was, testified that when he first saw the boy the latter was suffering from "tetanus and an infection of his leg . . . the smear of which showed

a staphylococcus infection. . . . His neck was stiff, he was unable to open his mouth more than about half an inch, the muscles of his abdomen were rigid, and he had generalized rigidity of all the voluntary muscles." Dr. Shallow "ordered the injection into the patient of a tetanus anti-toxin . . . of 15,000 units." A few hours later, he operated on the boy, and "excised the wound tract and the adjacent tissue down to the deep fascia, leaving the wound wide open." He took out "the tract which was infected" and removed "all of the devitalized tissue and some of the sound tissue." His operation he described technically as a "debridement—an incision for the extent of the tract." He added: "I take that entire area out because that tract is where the tetanus organism is lodged." "Tetanus," he said, "is a local disease, and the toxins spread and the effect of that [incision] is that they do not get into the blood stream." Twenty-three days later Dr. Shallow performed a second operation known as a "closure." He said that the boy "had a gap in his leg . . . and in order to bring the tissue together you have to undermine the sound skin on that side and undermine the sound skin on the other side and sew them together." This "shortens the convalescent period." The boy was in the hospital about four weeks; a total of 750,000 units of anti-tetanus serum was administered to him. The boy's mother expended over $1,500 for the medical attention and hospital care given him. The boy and his mother by proper proceedings brought suit for the damages sustained.

At the trial five reputable physicians and surgeons testified in behalf of the plaintiffs. They declared that for such a punctured wound as the minor plaintiff suffered under the circumstances present in this case, where the danger of tetanus infection is imminent, the course of treatment prescribed in the standard medical books, taught at medical schools and hospitals and generally administered in the community by the average physi-

cian and surgeon, is the prevention of tetanus by "careful antisepsis . . . and . . . every punctured wound is to be incised to its depths and thoroughly cleaned and drained . . . and . . . [the victim] given a subcutaneous injection of 1,500 units (9 cm. of horse serum) of tetanus antitoxin and repeat this injection within ten days."

Dr. Bigelow, the appellant, testified on cross-examination that the medical textbook "Modern Surgery" by Dr. John Chalmers Da Costa (10th ed.), is an authority on the treatment of punctured wounds and that it teaches that "every infected wound must be disinfected with the most scrupulous care. Every punctured wound is to be incised to its depths and thoroughly cleaned and drained. In a very suspicious wound, such as a Fourth of July injury or a wound from a dung fork, or the entrance into the tissues of a splinter from a stable floor, after the removal of foreign objects a thorough antiseptic cleansing, give a sub-cutaneous injection of 1,500 U. S. A. units (9 cm. of horse serum) of tetanus antitoxin and repeat within ten days. It is certain that tetanus anti-toxin has prophylactic power. Prevention is not always assured. Many cases have been reported in which prophylactic injections fail to prevent the disease. When in spite of such injections the disease does arise, it is apt to be mitigated in violence." Dr. Bigelow admitted that he did not incise this boy's wound to its depth, though he knew that "implements that have been in contact with street dirt and dirt in general, are apt to be infected" and that "such a wound is a suspicious wound." When asked how he justified his treatment in the face of the accepted teaching of Dr. Da Costa in this class of cases, he answered: "Because in the treatment of a wound it is a matter of personal judgment in the experience of that one, as to how you treat it." He was asked this question: "So the wound when you finished treating

it was still a puncture wound rather than an incised wound?" and he answered: "Yes."

The defendant called nine physicians of good professional repute and their testimony was in effect as one of them stated, that from their knowledge of the subject "a substantial group of physicians in good standing in Philadelphia in May, 1936, would have rendered the same treatment which Dr. Bigelow did in this case" and that this kind of treatment "is a reasonably successful treatment."

The jury found a verdict in favor of the defendant. The court in banc allowed plaintiffs' motion for a new trial, saying: "Among the reasons assigned in support of plaintiffs' motion for a new trial are some directed at the comments and rulings of the trial judge. After a careful review of the entire record we are of opinion that perhaps some of the rulings and remarks may have been prejudicial to the plaintiffs, and principally for that reason grant the motion. . . . Both parties called a number of medical practitioners. On behalf of plaintiffs all their witnesses agreed that the correct method of treatment of a wound of the type described was that adopted and followed by Dr. Shallow after the symptoms of tetanus developed. Those medical witnesses called on behalf of defendant, on the other hand, agreed that the proper method of treatment was that employed and followed by defendant. . . . Plaintiffs' contention appears to be that there was negligence in the selection or determination of the method to be pursued. This we regard as a close question and defendant's position seems to be supported by the language used in *Remley v. Plummer,* 79 Pa. Superior Court 117, wherein it was said, among other things: 'Thus practitioners of a reputable school of medicine are not to be harassed by litigation and mulcted in damages because the course of treatment prescribed by that school differs from that adopted by another school: *Force v. Gregory,* 63 Conn. 167, 27 A. 1116;

*Grainger v. Still,* 187 Mo. 197, 85 S. W. 1114; 21 R. C. L. 383; 5 Thompson on Negligence, Section 6715. As was said in *Patten v. Wiggin,* supra, "The jury are not to judge by determining which school, in their judgment, is the best.' 'If the treatment is in accordance with a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is best, nor to decide questions of surgical science on which surgeons differ among themselves": 30 Cyc. 1588, section 8. . . .' If the testimony offered from the plaintiffs' medical experts had shown a division of opinion (or different schools of thought) regarding the method to be pursued in the treatment of the wound described, we would unhesitatingly reach the conclusion suggested in *Remley v. Plummer,* supra, and *Patten v. Wiggin,* supra, i. e.; 'The jury are not to judge by determining which school, in their judgment, is the best.' In this case, however, all of plaintiffs' medical experts agreed that the method pursued by defendant was not in accord with the proper treatment of the wound. The contrary opinion was asserted by all the medical experts who testified for defendant. These witnesses, in our judgment, were as reputable and as abreast of the progress in the science of medicine as those for the plaintiffs. We think, therefore, that since the experts on one side are in conflict or disagreement with the experts on the other side the case presents an issue of fact for submission to a jury. . . . We conclude, however, that this question *is so close* that plaintiffs should not be deprived of the right to recover unless and until an appellate court has said that a physician is liable, notwithstanding that in his judgment and the judgment of a number of physicians called on his behalf one course of treatment is proper, whereas on behalf of the plaintiffs a number of physicians are of the opinion that a different method should have been employed, without showing more than that they differed from one school of thought as to the prop-

er method to be pursued in the treatment of a certain type of injury."

Defendant appealed from the order granting a new trial, claiming that his point for binding instructions should have been affirmed and that there was no issue of fact for the jury's determination. If defendant's point for binding instructions should have been allowed, his appeal from the granting of a new trial is proper: *Fornelli v. P. R. R. Co.*, 309 Pa. 365, 164 A. 54; *Straus v. Rahn*, 319 Pa. 93, 179 A. 445; and *Walters v. Federal Life Ins. Co.*, 320 Pa. 588, 184 A. 25.

The first question for us to decide is whether or not plaintiffs made out a prima facie case of malpractice against the defendant; if this question is answered in the *negative*, the verdict in favor of the defendant should stand and no new trial should be had. If the question is answered in the *affirmative*, we then are faced with the second question, which is: Did the court err in granting a new trial?

What malpractice is and what must be proved by him who bases an action at law on such a charge against another, in order to make out a case for submission to a jury, has often received the attention of the courts of this and of other jurisdictions, and of text-writers. Before deciding the questions presented to us, we will review the principles which must be applied to the adjudication of malpractice cases.

"Malpractice consists of a negligent or unskilful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act": Wharton & Stille's "Medical Jurisprudence" (5th ed.), Vol. 3, section 499. "Where a physician exercises ordinary care and skill, keeping within recognized and approved methods, he is not liable for the result of a mere mistake of judgment. There is no responsibility for error of judgment unless it is so gross as to be

inconsistent with the degree of skill which it is the duty of every physician to possess": Ibid, sec. 501 (citing cases). See 3 Blackstone's Commentaries 165.

A case which is frequently cited on the subject of malpractice is that of *McCandless v. McWha,* 22 Pa. 261, which holds: "We have stated the rule to be reasonable skill and diligence; by which we mean such as thoroughly educated surgeons ordinarily employ. . . . The law has no allowance for quackery. It demands *qualification* in the profession practised—not extraordinary skill such as belongs only to few men of rare genius and endowments, but that degree which ordinarily characterizes the profession. And in judging of this degree of skill, in a given case, regard is to be had to the advanced state of the profession at the time. . . . The physician or surgeon who assumes to exercise the healing art, is bound to be up to the improvements of the day. . . ." This case was cited with approval and quoted from in *English v. Free,* 205 Pa. 624, 55 A. 777. In accord with the foregoing is the decision of this court in *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558.

In 21 R. C. L. pages 384 and 390, respectively, there are laid down these principles: "Section 29. In determining the degree of care and skill which the law exacts of physicians and surgeons, regard must be had to the state of advancement of the profession at the time of the treatment. They are held to exercise the ordinary care and skill of their profession in the light of modern learning and enlightenment on the subject. Their treatment is measured by the standard existing at the time they practice, and not that which may have existed at some time in the past. . . . It is incumbent on him to conform to the mode established by his school of practice for the treatment of a given case, and if he departs therefrom he does so at his peril. . . . A physician may adopt new methods if they are approved. . . . Section 35. . . . The law may re-

quire a physician to base any professional decision he may make on skill and careful study and consideration of the case, but when the decision depends on an exercise of judgment, the law can further require only that the judgment be bona fide. . . . It is obvious that an exercise of judgment is not really bona fide and is no protection to him, unless it is founded on his intelligence, skill, knowledge and care. And an error of judgment may be so gross as to be inconsistent with the use of that degree of skill and care that it is the duty of every physician and surgeon to bring to the treatment of a case."

In *Pike v. Honsinger*, 155 N. Y. 201, 49 N. E. 760, the Court of Appeals of New York said: "Upon consenting to treat a patient, it becomes his [a physician's] duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. . . . He is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been." To the same effect is *Cayford v. Wilbur*, 86 Me. 414, 29 A. 1117.

In *Wohlert v. Seibert*, 23 Pa. Superior Ct. 213, that court held "that the standard by which the degree of care, skill and diligence required by physicians is to be determined, is not the highest order of qualification obtainable, but is the care, skill and diligence which are ordinarily possessed by the average of the members of the profession in good standing; that the acquisition of professional learning and skill being required by law, it is the duty of a physician and surgeon to acquire the same, and he is liable for injuries caused by the failure of duty to exercise such learning and skill."

In *Sawdey v. Spokane Falls & Northern Ry. Co.*, 30 Wash. 349, 70 Pac. 972, the Supreme Court of Washington said: "A surgeon must not experiment in his treatment of an injury. On the contrary, if he desires to avoid liability for his mistakes, he must treat it in some method recognized and approved by his profession as most likely to produce favorable results. If there be more than one of these applicable to the particular case in hand, he is not, of course, liable for an honest mistake of judgment in his selection of the method; but if bad results follow, and liability therefor is to be avoided, it must appear that the treatment applied was approved and recognized, as well as that it was pursued with ordinary diligence and skill."

In *Hewitt v. Eisenbart*, 55 N. W. 252, the Supreme Court of Nebraska said that "it is urged that the evidence is not sufficient to sustain the verdict. . . . The point urged seems to be that the experts disagreeing among themselves, and all of them indorsing a portion of the treatment pursued as proper under some circumstances, it cannot be said that Dr. Hewitt failed to exercise that degree of skill ordinarily possessed and exercised by members of his profession. In other words, that if, in such cases, the testimony shows that some surgeons consider the treatment adopted as proper, there can be no recovery. The adoption of this view would be to change the rule of liability so as to hold a surgeon responsible only when his acts evidence a want of skill below that of the most unskillful surgeon whom the defendant might be able to produce. The jury must judge of the skill and qualifications of the expert witnesses, as well as of the defendant in the action, and it is for the jury to say, upon all the evidence, what treatment amounted to negligence, under the rule of skill required."

In *Baker v. Hancock*, 63 N. E. 323, the Appellate Court of Indiana held: "In an action for malpractice arising out of the treatment given plaintiff for cancer,

evidence of particular treatment of other patients for cancer, showing that such treatment was largely successful, is inadmissible for the purpose of proving the competency of the physician. One holding himself out as a general practitioner of medicine and surgery is bound to possess and exercise the average degree of skill possessed by members of the profession practicing in similar localities, in the light of the present state of medical science."

McClelland on "Civil Malpractice," p. 43, says: "The degree of learning and skill which the physician and surgeon holds himself out to possess is that degree which is ordinarily possessed by the profession, as it exists at the time, or contemporaneous with himself, and not as it may have existed at some time in the past. . . . A physician and surgeon must in general be held to apply in his practice what is thus settled in his profession: citing Elwell on Malpractice, 31." Page 44: "That which is pronounced as settled in any profession by the leading and standard authorities therein is within the reach of any practitioner; and his being such practitioner, in general, presupposes the fact, and is guaranty on his part that he is in possession of a knowledge of it as so settled." Page 215: "Physicians should be charged with the consequences of mere errors, only where such errors could not have arisen except from want of reasonable skill or diligence. *Hart v. Frame,* 3 Jur. 547; S. C. Macl. R. 595; 6 C. & F. 193." Page 274: "The law contemplates a judgment founded upon skill and knowledge in the science of anatomy, surgery, and physics."

In *Erastus Tefft v. H. Wilcox,* 6 Kan. 59, it is held: "A jury must be informed as to the facts or criterion upon and by which the standard of ordinary skill and ordinary care and diligence rest. . . . And to supply such need, evidence may properly be introduced as showing such facts. This evidence must, from the very nature of the case, come from experts, as other witnesses

are not competent to give it, nor are juries supposed to be conversant with what is peculiar to the science and practice of the professions of medicine and surgery to that degree which will enable them to dispense with all explanations. . . . The whole question seems to be one of mixed law and fact, and is so to be regarded."

In the Encyclopedia of Evidence, Vol. 9, page 850, is found the following statement: "Although it has been recognized as possible that there may be cases where the mode of treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure was owing to unskillful or negligent treatment, it has also been held that the jury should not be permitted to find malpractice without testimony from persons who are qualified to give opinions on the methods of treatment. But it is not necessary that all the expert witnesses called should consider the treatment pursued by defendant as improper, nor will the fact that all such witnesses agree that a portion of the treatment is proper under some circumstances, in itself defeat a recovery." In Vol. 5 of the same work appears the following at page 582: "In actions for malpractice and in similar cases, where the question may properly arise, medical experts will be allowed to testify as to whether certain treatment was proper and sanctioned by physicians and surgeons possessing and exercising ordinary skill and intelligence."

In *Viita v. Fleming*, 155 N. W. 1077, L. R. A. 1916-D, page 644, the Supreme Court of Minnesota said: "Error is assigned in sustaining an objection to a question asked of defendant as to whether the treatment by a certain other physician of a fracture in another case was similar to that employed by this doctor. That this ruling was proper is plain. . . . It is not the law that defendants' conduct of the case is to be judged by the degree of skill and care exercised by other physicians in the same village. . . . The locality in which

the physician or surgeon practices must be considered in determining whether he has the requisite skill and learning, but we do not think that he is bound to possess and exercise only that degree of skill and learning possessed by other practitioners in the same locality, if by that is meant the same village or city. If the same general locality is meant, as, for instance, the Northwest, or the state, no fault could be found with such a rule. But in these days the physician or surgeon in a village is not hampered by lack of opportunity for advancement. Frequent meetings of medical societies, and extensive experience in hospital work, put the country doctor on more equal terms with his city brother."

In *Carpenter v. Blake,* 60 Barbour (N. Y.) 488, it was held: "When it is proved that the surgeon has omitted altogether the established mode of treatment, and adopted one that has proved to be injurious, evidence of skill, or of reputation for skill, is wholly immaterial, except to show (what the law presumes) that the defendant possesses the ordinary degree of skill of persons engaged in the same profession. In such a case it is of no consequence how much skill he may have; he has demonstrated a want of it in the treatment of the particular case. . . . The failure to use skill, if the surgeon has it, may be negligence; but when the treatment adopted is not in accordance with established practice, but is positively injurious, the case is not one of negligence, but of want of skill. . . . Some standard, by which to determine the propriety of treatment, must be adopted; otherwise experience will take the place of skill, and the reckless experimentalist the place of the educated, experienced practitioner. . . . When the case is one as to which a system of treatment has been followed for a long time, there should be no departure from it, unless the surgeon who does it is prepared to take the risk of establishing, by his success, the propriety and safety of his experiment."

Herzog on "Medical Jurisprudence," page 153, sec. 180, says: "If a physician, in the course of his prac-

tice, is guilty of any dereliction of duty toward one of his patients, or fails to use proper skill and knowledge in the diagnosis or treatment of a patient's ailment, he is guilty of malpractice." . . . Page 157, sec. 183: "Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable. . . . Departure from approved methods in use will render a physician liable if he injures the patient, no matter how good his intentions may have been, so a physician must be very careful in adopting a new method of treatment or one which is not recognized by the school of medicine to which he belongs, for if his treatment should prove injurious to the patient he would be liable for not having used recognized methods." Page 168, sec. 192: "The accepted rule is that negligence must be proved by expert medical testimony unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it."

In the instant case, there was unanimity of testimony on both sides that a *puncture* wound in order to be treated properly should be incised to its depth and thoroughly drained and that a sub-cutaneous injection "of tetanus anti-toxin" should be given. Defendant's witnesses, however, say that this wound was *not* a puncture wound. This raised a factual question for the jury. The defendant himself referred to the boy's wound as a "large puncture wound" and described it as "about five inches long." Defendant's witness, Dr. Arthur P. Keegan testified: "That is a big lacerated wound. . . . I disagree that the wound you [plaintiffs' counsel] describe is a puncture, because he has a big opening, he can put a pledget of cotton in it, it is not made by a needle point or a sword point." Another witness for the defendant, Dr. W. O. Livingstone was asked these questions and made the following answers: "This is

what you would call a puncture wound, is it not, what the child had? A. Not strictly a puncture wound, no. Q. Why is it not strictly a puncture wound? A. Because it had a large external opening. . . . Q. Referring to this definition of a punctured wound, and also bearing in mind what the minor plaintiff in this case had, can you now tell me whether you agree with Dr. Da Costa's statement on page 143 that every punctured wound is to be incised to its depths and thoroughly cleaned and drained? A. I believe this wound was not what Dr. DaCosta refers to as a puncture wound. Q. In what respect does it differ? A. A puncture wound is one that goes deeply into the tissues with a tendency for the wound to heal up on the surface and leave certain raw places down deep in the tissue where a germ that cannot live on air can multiply and, conceivably, produce tetanus." Another witness for the defendant, Dr. E. L. Keyte, a police surgeon, testified: "Q. What is the type of wound which existed in this case? How would you define it? A. I cannot agree that it is a punctured wound, it is more of a tunneling wound, where something tunnels in the subcutaneous area between the skin and the more important elements beneath." On cross-examination, the following questions were asked of this witness and the following answers given by him: "Q. When a person's life depends upon your skill and care, don't you feel you are doing the safe thing when you give it [anti-tetanus serum] to a fireman who has stepped on a rusty nail? A. We give it in a puncture wound, that is right. Q. A puncture wound is one in which air is not apt to get, isn't that true, sir? A. That is correct, I believe, air can't get to all parts of the damaged tissue. Q. You say Dr. Owen is one you have talked to on the subject of the treatment of wounds, and one of those from whose practice you form an opinion as to what the average practitioner of ordinary ability does? A. Right. . . . Q. Now I show you a copy of a paper called, 'Treat-

ment of Tetanus' by Hubley R. Owen and J. Wesley Tomlinson, M. D., in which it is set forth, 'The question of which cases should receive tetanus antitoxin often arises. Of course all punctured wounds, gunshot wounds, devitalized wounds, deep lacerations, compound fractures and extensive burns should receive it. In the borderline cases it is a safe rule to follow that when in doubt, always administer antitoxin.' Would you agree with Dr. Owen's statement to that effect, when in doubt administer it? A. In police work I would. I believe anybody would do it when they are in doubt." Another witness for defendant, Dr. R. S. Davis, made the following answers to the following questions: "Q. Dr. Davis, Mr. Ferguson just asked you about puncture wounds; can you describe this as a punctured wound? A. Absolutely not. Q. What kind of wound would you call this? A. According to the testimony which I heard, this was a wound which only penetrated the skin, with a wide opening, like a blister, a traumatic blister, it simply was an elevation of the skin from the muscular tissue. Q. Is that in your opinion the kind of puncture wound the textbooks and the literature talked about when they referred to puncture wounds? A. Not at all." Dr. John W. Klopp testified for defendant that the boy's wound was not a puncture wound because "this wound had a large mouth, according to your description [i. e., the description of defendant's counsel in his hypothetical question] which provided for adequate exposure to the air and an adequate means of putting in and taking out a drain and swabbing it with antiseptic solutions." On cross-examination, he admitted that "any wound, no matter how made, might possibly be infected with the tetanus germ." He also said on cross-examination that he agreed with this statement from Ashurst's textbook: "Punctured wounds, as the term indicates, are those produced by pointed instruments, and their importance arises from the fact

that infection (not rarely tetanus) is frequent, as no free drainage exists."

In view of the fact that all the witnesses on both sides agree that there is a well-recognized, established mode of treatment of a puncture wound in order to prevent the onset of lock-jaw, and that this method was not followed in the instant case, plaintiff made out a prima facie case of malpractice against the defendant provided there was proof that this was a "puncture wound." Defendant's own testimony on cross-examination, standing alone, would support the contention that it was a puncture wound, for he admitted it so to be. Likewise, the description of the wound would support an inference that it was a puncture wound, as the physicians called on behalf of plaintiffs testified it was. Since defendant's witnesses declared from the description of the wound given them in hypothetical questions, that it was *not* a puncture wound, a clear issue of fact was raised for the jury's determination and binding instructions for the defendant were properly refused.

The case of *Duckworth et al., v. Bennett*, 320 Pa. 47, 181 A. 558, is easily distinguishable from the instant case. There the malpractice alleged was that the defendant did not take an X-ray of his patient's hip for eight weeks following his injury and that his failure to do so was negligent and the delay in ascertaining the cause of the trouble resulted in making the injury permanent. Defendant and four surgeons whom he called testified that what was shown by the X-ray photograph was not a fracture of the femur but a slipping of the epiphysis, that this was due not to trauma but to infection, that the defendant's diagnosis of arthritis of the knee was correct, that there was nothing to put him on notice of anything wrong with the hip. This court, in an opinion by Mr. Justice SCHAFFER, said: "At most all that could be said is that defendant had made a mistake in diagnosis where the symptoms were obscure, and for this there is no liability:

*English v. Free,* 205 Pa. 624 [55 A. 777]; *Remley v. Plummer,* 79 Pa. Superior Ct. 117. Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in his community: Ibid." In that case (i. e., the Bennett Case), the court below, in its opinion justifying the binding instructions given for defendant, said: "Dr. Grimm, the only medical witness for the plaintiff, testified as to what should be done and what tests should be made in order to make a proper diagnosis in a case of this sort. When Dr. Bennett [the defendant] was called, he testified as to what tests he had made in his diagnosis, and, according to his testimony, he had made every test which Dr. Grimm had said would be proper under the best medical practice. A physician or surgeon is not liable for a mistaken diagnosis, but is liable only if he does not use the approved tests in order to arrive at such diagnosis. (*Williams v. LeBar,* 141 Pa. 149). There was no testimony that the defendant was negligent in the methods employed to ascertain the seat of the trouble; and no presumption of negligence would arise from the fact that he was mistaken as to his diagnosis. 'The duty imposed on a physician or surgeon is to employ such reasonable skill and diligence as is ordinarily exercised in his profession in the same general neighborhood, having due regard to the advanced state of the profession at the time' (*Moscicki v. Shor,* 107 Pa. Superior Ct. 192). See also *McCandless v. McWha,* 22 Pa. 261; *English v. Free,* 205 Pa. 624; *Stemons v. Turner,* 274 Pa. 228; *Wohlert v. Seibert,* 23 Pa. Superior Ct. 213; 21 R. C. L. 386. . . . Under this state of evidence, there was, therefore, no medical question to submit to the jury; and a jury of laymen should not be permitted to guess on a medical question where there is no dispute among physicians as to the methods used."

In the instant case there was no dispute among physicians as to the method that should have been used *if the patient's wound was a puncture wound.* If the wound was a puncture wound, defendant failed to use the established and proper method of treatment. As to whether or not the wound was a puncture wound, there was raised (as we have heretofore pointed out) an issue of fact for the jury.

The jury might well have found that it *was* a "puncture wound," for the defendant himself, who had a full opportunity to examine it, not only characterized it as such but his description of it fits perfectly into the medical definition of a punctured wound. He said the wound was "a punctured wound and shallow, being next to the surface, and just under the skin, *about five inches in length"* (italics supplied). Christopher's "Minor Surgery," 2nd ed., p. 30, says: "Punctured wounds are those in which the orifice is relatively small compared to the depth of the wound. . . . The entrance rapidly seals over and the depths of the wound which have been invaded by the nail or missile are excellent soil for anaerobic organisms." Dr. John C. Da Costa in "Modern Surgery," 10th ed., p. 99, says: "Punctured wounds are made by pointed objects, as needles, splinters, etc. The depth of a punctured wound greatly exceeds its surface area." Dr. Shallow had his assistant, Dr. Fry, treat the wound as the medical authorities say a punctured wound should be treated. The doctors defendant called to testify in his behalf did not see the wound but based their testimony on hypothetical questions.

The case of *Remley v. Plummer,* 79 Pa. Superior Ct. 117 (referred to in the opinion of the court below) is also easily distinguishable from the case now before us. In that case the malpractice alleged was that a stimulant should have been given a patient before an anesthetic had been administered to him and that chloroform should not have been substituted for ether as an anesthetic. In entering judgment for defendant, Judge

KELLER well said: "The question actually passed upon by the jury was not whether the defendants, in their handling of the case, had been guilty of negligence in not following a well-recognized and established mode of treatment, but rather, which of two methods, both having their respective advocates and followers of respectable authority, was the safer and better from a surgical standpoint." In other words, a physician has a right to choose between two professionally recognized methods of treatment of an injury or a malady. Because unfortunate results follow the use of one of two or more of such methods, it does not make out a prima facie case of malpractice against the physician or surgeon who made the choice. Judge KELLER said further in the Plummer Case: "If there is a reasonably general agreement as to what is the proper medical treatment for a disease or the proper surgical treatment for an injury and there is a dispute as to whether the physician or surgeon in charge of the case used the method or means thus generally prescribed, a question of fact is presented which is for a jury to determine. Or if the symptoms of a disease or the effects of an injury are so well known that a reasonably competent and skillful physician or surgeon ought to be able to diagnose the disease or injury, his negligence in failing to do so is likewise a matter of fact on which a jury of laymen may pass judgment." An examination of the testimony in the Plummer Case shows that there were three surgeons called by the plaintiff, that the testimony of one of them (whose qualifications to testify as an expert were doubtful) amounted to not much more than a "guess," it being a personal opinion not based on any recognized standard; that the testimony of another physician was that a local anesthetic should have been used, instead of a general anesthetic (a mere choice between two established methods); and that the testimony of another surgeon was an expression of his opinion that it was "not good surgery to administer an

anesthetic without first fortifying the patient by the use of a heart stimulant." This testimony obviously fell short of making out a prima facie case of malpractice. On the other hand, in the instant case, if the jury found (as it well might have) that the patient's wound was a "puncture wound," there *was* evidence that defendant's treatment of the wound fell short of being "proper medical treatment" according to the established standard of proper treatment in such cases.

A departure from established standards of practice, unless justified by circumstances, often makes out a prima facie case of malpractice. For example, it has been repeatedly held by the courts that the failure on the part of physicians to take X-ray pictures, or have them taken, as an aid to a correct diagnosis, when X-ray machines are available and are commonly used by physicians in similar cases, may be actionable negligence: *Peterson v. Hunt* (Wash.), 84 P. 2d 999; *Hoover v. McCormick*, 197 Ky. 509, 247 S. W. 718; *James v. Grigsby*, 114 Kan. 627, 220 P. 267; *Whitson v. Hillis*, 55 N. D. 797, 215 N. W. 480; *McBride v. Saylin*, 6 Cal. 2d 134, 56 P. 2d 941.

The rule in Pennsylvania is *not* that "for a mistake in diagnosis there is no liability," but it is that "for a mistake in diagnosis *where the symptoms were obscure* . . . there is no liability" (italics supplied): *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558. Here there was nothing obscure about the nature of the patient's wound. If it was a puncture wound, as the defendant described it and as its depth indicated and as the onset of lockjaw later showed that it was, *that fact was determinable by visual inspection.* Furthermore, on the 6th day after the injury the boy's stepfather told the physician that the boy "had complained about his jaw hurting him or being stiff." This was a fact which, coupled with the fact of the wound then six days old, strongly suggested that the germ of lockjaw was in the boy's system, and it seems to us that

ordinary professional vigilance would then have sug-
gested the administering of the anti-tetanic serum which
another doctor administered on the next day, after find-
ing the boy to be suffering with "definite stiffness of
the masseter muscle."

No claim is made in this case by the defendant that
his failure to administer the anti-tetanic serum was due
to any hyper-sensitivity on the part of the patient to
this serum or that he, the defendant, made any tests
to determine whether or not the patient had any such
hyper-sensitivity. The record shows that the boy was
not hyper-sensitive to serum. Dr. Shallow testified that
in the hospital the anti-tetanic serum was injected into
the boy *after* he was tested for his sensitivity.

Appellant also complains that there was no evidence
showing a causal connection between the defendant's
alleged malpractice and the lockjaw which the patient
suffered. The facts on this record amply support an
inference that had the patient been treated with anti-
tetanic serum when the defendant first attended him,
the onset of lockjaw would have been averted.

The medical testimony offered by plaintiffs, notably
that of Dr. Downs, showed the efficacy of promptly ad-
ministered anti-tetanic serum in preventing lockjaw.
The successful hospital treatment of this patient with
this serum (though administered belatedly) proved its
potency. Causal connection between two facts may be
shown by either direct or circumstantial evidence. See
the following cases: *Kohlmeyer v. Ohio Valley Water
Co.,* 58 Pa. Superior Ct. 63; *Norwood v. Goeddel,* 58 Pa.
Superior Ct. 500; *Cowan v. Bouffleur,* 192 Illinois A.
21; *Tate v. Tyzzer,* 208 Mo. A. 290, 234 S. W. 1038;
*Fowler v. Scheldrup,* 166 Minn. 164, 207 N. W. 177;
*Kruger v. Bossingham,* 152 Minn. 248, 188 N. W. 324;
and *Pelky v. Kivlin,* 199 App. Div. 114, 191 N. Y. S.
428. When a finding is a reasonable inference from
the facts and conditions directly proved, it must be
classed as legal evidence and not as a mere conjecture,

surmise or guess. See *Gray v. Com.*, 101 Pa. 380. Wigmore says in the 2nd edition of his Evidence, Vol. 1, sec. 27, p. 232: "The conclusions and tests of everyday experience must constantly control the standards of legal logic."

This was clearly a case for the jury; the primary issue of fact was *the nature of the wound.* If it was a punctured wound (as its size, 5 inches in depth, with a diameter of one-half inch, *indicates* it was), all the professional witnesses on both sides testified in effect that the treatment administered by the defendant was *not* proper. If it was *not* a punctured wound, there was a difference of professional opinion as to whether or not the treatment administered by the defendant was proper. This fundamental issue the trial judge did not make clear to the jury. In plaintiff's petition for a new trial it was correctly said: "The court gave the jury no light whatever in respect to the extremely simply scientific facts at issue, which were (1) whether or not the minor plaintiff had had a puncture wound; and (2) whether defendant had treated it as a physician of average ability would have done; contenting himself only with telling the jury, in substance and effect, that if they believed the witnesses for one side they should find for that side, etc." This court has declared that "it is a primary duty of the trial judge —a duty that must never be ignored—in charging a jury to clarify the issues so that the jury may comprehend the issues they are to decide." We have decided that "a trial judge's charges which are inadequate or not clear, or which tend to mislead are well recognized grounds for reversal": *Sears v. Birbeck,* 321 Pa. 375, 383, 391, 184 A. 6.

There were many other reasons (all set forth in plaintiff's petition for a new trial in the court below) why a new trial was justly ordered. For example, the trial judge said in the jury's hearing of one item of testimony: "The effect of that is, of course, to destroy Dr.

Shallow's testimony.". It is not the province of a trial judge to declare that one witness's testimony destroys another's. The credibility and weight of all testimony is for the jury. The court below frankly admits that "after a careful review of the entire record we are of opinion that perhaps some of the rulings and remarks may have been prejudicial to the plaintiffs, and principally for that reason grant the motion." The court below was in the best position to judge of the prejudicial character of the trial judge's remarks, and we agree that the remarks complained of by the plaintiffs *were* prejudicial.

The order granting a new trial is affirmed.

DISSENTING OPINION BY MR. JUSTICE SCHAFFER:

I am not in agreement with the views expressed in the majority opinion. The case is turned upon the narrow question whether the wound was in reality a puncture wound. Whether or not it was, is a matter not for laymen to decide, but for physicians. Here competent physicians, in number exceeding those called by plaintiffs, said, in their judgment, it was not a puncture wound. The term "puncture wound" is a technical scientific term, and means something entirely different to the physician from what it might mean to the layman. As physicians use the term, it means a wound with a small opening, in comparison with its depth, which is liable to close and thus prevent the entry of air into the wound. The bacillus of tetanus cannot live in the presence of air and the closing of the orifice of the wound, and the consequent shutting off of air, leads to the multiplication of the tetanus bacilli if present. Here the wound, which was underneath the skin and parallel with the surface of the skin, and did not penetrate the deeper tissues, had an opening half an inch wide, which enabled the appellant to probe to the bottom and to apply medication, and, by the insertion of gauze, to keep it open to the air. This being the con-

dition, the nine physicians called by him, said it was not a puncture wound, and therefore did not require to be opened up or demand the use of anti-tetanus serum. When the defendant said, as noted in the majority opinion, that it was a punctured wound, he meant one caused by a puncture, not by a cut or incision. His explanation shows that he did not mean it was a puncture wound in the surgical sense. I can see no distinction between this case and any other in which competent physicians differ as to conditions present in the patient, and when they do, and when the physician charged with malpractice has, as this defendant has, reputable surgical opinion supporting what he did, he should not be held liable, in my judgment.

The correct announcement of the law, I believe, is that embodied in the opinion of President Judge KELLER in *Remley v. Plummer,* 79 Pa. Superior Ct. 117, 121, wherein he said: "The question actually passed upon by the jury was not whether the defendants, in their handling of the case, had been guilty of negligence in not following a well-recognized and established mode of treatment, but rather, which of two methods, both having their respective advocates and followers of respectable authority, was the safer and better from a surgical standpoint. In other words, in the face of conflicting reliable expert evidence as to what was the proper course to be pursued by the surgeon in charge of the case, twelve laymen, with no knowledge of medicine and surgery were called upon to decide a disputed scientific medical and surgical question upon which eleven physicians and surgeons of standing and experience could not agree, and as to which there is a wide divergence of competent authority, and were permitted to mulct the defendants in damages for following a course of conduct which by far the greater number of expert witnesses testifying said was in accordance with that indicated by the best modern surgical practice. . . . where competent medical authority is divided, a

physician will not be held responsible if in the exercise of his judgment he followed the course of treatment advocated by a considerable number of his professional brethern in good standing in his community. . . . In cases where authorities differ or 'doctors disagree' the competent physician is only bound to exercise his best judgment in determining which course is on the whole best." We followed the philosophy of that case in *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558.

At the most, all that can be said giving full effect to plaintiffs' medical evidence is that the doctor made a mistake in not diagnosing the wound as a puncture wound, and for a mistake in diagnosis there is no liability: *English v. Free,* 205 Pa. 624, 55 A. 777; *Ward v. Garvin,* 328 Pa. 395, 195 A. 885.

I can readily understand why a doctor would hesitate to use tetanus serum in a case in which he did not think it required, because of the danger in its use. This has been shown in the recent case decided by the Superior Court, *Gyulai v. Prudential Ins. Co. of America,* 135 Pa. Superior Ct. 73, 4 A. (2) 824, where the use of tetanus serum caused the death of the patient, as well as by the physicians who testified in this case.

Mr. Justice LINN and Mr. Justice BARNES join in this dissent.

DISSENTING OPINION BY MR. JUSTICE LINN:

I concur in the conclusion reached by Mr. Justice SCHAFFER and should like to add that, in my judgment, the appeal presents a simple case. (1) The application of standards of medical practice has been settled in this Commonwealth: if there are two recognized methods of treatment, a physician, without being guilty of malpractice, may adopt and apply either. Both sides gave medical evidence, plaintiffs' witnesses testifying that defendant should have treated the wound by a different method than was adopted, while defendant's witnesses testified that the treatment applied was prop-

er. The jury found for the defendant, a finding which means that he applied a recognized treatment.

(2) The reason given for granting the new trial shows, I think, that the learned judge made a mistake of law which it is the duty of this court to correct. He said: "Among the reasons assigned in support of plaintiffs' motion for a new trial are some directed at the comments and rulings of the trial judge. After a careful review of the entire record we are of opinion that perhaps some of the rulings and remarks may have been prejudicial to the plaintiffs, and principally for that reason grant the motion."

I have examined the record in the light of the motion for a new trial and think the rulings and comments were not harmful. The other reason to which the court refers is thus stated at the end of the opinion: "In this case, however, all of plaintiffs' medical experts agreed that the method pursued by defendant was not in accord with the proper treatment of the wound. The contrary opinion was asserted by all the medical experts who testified for defendant. These witnesses, in our judgment, were as reputable and as abreast of the progress in the science of medicine as those for the plaintiffs. We think, therefore, that since the experts on one side are in conflict or disagreement with the experts on the other side the case presents an issue of fact for submission to a jury.

"Medical practitioners should not be harassed by litigation and mulcted for damages, except in clear cases of carelessness; not only because it would deter doctors from attempting to advance the science by experiments with new thoughts, but because it would almost surely result in the loss of his professional standing.

"We conclude, however, that this question is so close that plaintiffs should not be deprived of the right to recover unless and until an appellate court has said that a physician is liable, notwithstanding that in his judgment and the judgment of a number of physicians

called on his behalf one course of treatment is proper, whereas on behalf of the plaintiffs a number of physicians are of the opinion that a different method should have been employed, without showing more than that they differed from one school of thought as to the proper method to be pursued in the treatment of a certain type of injury."

If we understand what the learned judge meant by the last paragraph quoted (his statement may not have been accurately transcribed) it not only discloses no legal reason for setting aside the verdict, but shows there was error in doing so. For that reason, I think the order should be reversed and judgment entered on the verdict.

Mr. Justice SCHAFFER and Mr. Justice BARNES concur in this opinion.