**Vallone v. Creech**

*Judy Greenwood* and *William P. Murphy,* for plaintiffs. *Michael O. Pitt,* for defendant

GOODHEART, *S.J.,* July 16, 2002—

## INTRODUCTION

This is a medical malpractice case that was tried before the Honorable Legrome Davis and a jury in February 2002. Upon Judge Davis' appointment to the United States District Court, the matter was reassigned to me for post-trial proceedings.

After a review of the record and the parties' post-trial memoranda, and following oral argument, I entered an order dated June 11, 2002, granting the plaintiffs' motion for post-trial relief, and awarding a new trial.

This interlocutory order is appealable as of right, pursuant to Pa.R.A.P. 311(a)(6), and the defendant filed a notice of appeal on July 1, 2002. This opinion explains my decision.

## BACKGROUND

Plaintiff Dianne Vallone first came under the care of defendant Creech in March 1991, after a biopsy indicated the presence of an infiltrative lobular carcinoma in

her right breast. Shortly thereafter, she underwent a "lumpectomy" and remained in his care until December 1993, when (for reasons related to her insurance coverage) she began to treat elsewhere.

In August 1996, Mrs. Vallone noticed significant changes in her breast, and arranged to see Dr. Creech in October, which was the first date he had available. At that appointment, she told Dr. Creech about the changes in her breast, said that it had begun to hurt, and that she was extremely concerned about a recurrence of cancer.

Dr. Creech ordered a bone scan, some blood work and a mammogram. One week later, Mrs. Vallone returned to Dr. Creech and again expressed her concerns about the changes in her breast. Dr. Creech told her that the changes were a result of the radiation therapy she had undergone after the 1991 lumpectomy, and that she should visit him again in three months.

This pattern continued until December 2, 1997, when Mrs. Vallone presented with a red rash on her right breast. *Up to this point, Dr. Creech had not ordered a biopsy.*

During the December 2, 1997 visit, Dr. Creech diagnosed Mrs. Vallone with a reccurrence of cancer, a diagnosis that was confirmed by a biopsy the following week. Both of Mrs. Vallone's breasts were subsequently removed, and she underwent extensive chemotherapy treatment afterwards, however—according to the testimony of the plaintiffs' oncological expert, Donna Jean Glover M.D.—Dr. Creech's inexplicable delay in ordering a biopsy permitted Mrs. Vallone's cancer to progress to Stage IV, reducing her chance of cure from approximately 90 percent to zero.

The jury, however, returned a verdict finding that Dr. Creech had not been negligent. Based upon the testimony presented—including that of the defendant himself—and due to a significant flaw in the jury's charge, this verdict simply cannot stand.

## DISCUSSION

### 1. *The Verdict Was Against the Weight of the Evidence*

A party is entitled to a new trial when the verdict is "so contrary to the evidence . . ." that it shocks the court's sense of justice. *Cangemi v. Cone,* 774 A.2d 1262, 1265 (Pa. Super. 2001); *Watson v. American Home Assurance Company,* 454 Pa. Super. 293, 302, 685 A.2d 194, 198 (1996), *app. denied,* 549 Pa. 704, 700 A.2d 443 (1997).

Here, one of the plaintiffs' experts, Dr. Glover, testified that the applicable standard of care required an oncologist to order a biopsy *immediately* upon the detection of *any* change in the appearance of a breast from which a cancerous lump has been previously removed (N.T. 2/5/2002, p. 78), and that Dr. Creech's inexplicable failure to do so for a period of approximately 15 months was the primary reason why Mrs. Vallone went from having an almost 90 percent chance of cure to terminal cancer with a life expectancy measured in months.

The plaintiffs' other medical expert, Robert John Cole M.D., a radiation oncologist, agreed with Dr. Glover; Dr. Cole stated that if a patient presents five years after the completion of radiation therapy with new and dramatic changes in the breast, one must assume that the cancer has recurred until proven otherwise, that it is a

deviation from the standard of care not to order an immediate biopsy, and that—had Dr. Creech ordered one in October, 1996—he would have detected the cancer in sufficient time to give Mrs. Vallone a 90 percent chance of cure. (N.T. 2/5/2002, pp. 203-208.)

The testimony of the defendant's expert witness, Kenneth M. Algazy M.D., actually *supports* that of the plaintiffs' experts, as shown by the following exchange taken from Dr. Algazy's videotaped deposition, which was shown to the jury in lieu of live testimony:

"[By plaintiffs' counsel]

"Question: Sir, do you agree with Dr. Creech when he said [in deposition testimony], if you think it's possible that the change you're seeing in the breast could be due to cancer, it's your obligation to send her for a biopsy, or doesn't he know what he's talking about?

"Answer: Well, I agree with that, but he obviously didn't feel that there was a chance that this was cancer, otherwise he would have done something." (Algazy deposition, 2/6/02, pp. 54-55.)

Contrary to Dr. Algazy's belief, Dr. Creech knew that the changes in Mrs. Vallone's right breast could have been caused by a recurrence of cancer as early as the October 1996 appointment, as shown by Dr. Creech's own testimony:

"[By the defendant's counsel]

"Question: So in October of 1996, Mrs. Vallone presents to you with these nipple changes, what is in the differential diagnosis?

"Answer: I looked at this and said, what in the world is going on here? *It could be a recurrence of her cancer.*

It could be due to the radiation therapy, so my question to her, to help me figure out which it is, is are these new changes or are these changes that occurred before?

"Question: What did she tell you?

"Answer: And she said, these are not new changes. These are changes that I've had before, so initially I had recurrent breast cancer, radiation changes, she tells me they're not acute. I knew from 1993 that she was starting to have the chronic changes due to radiation therapy. The scar was indenting, it was getting fuller, and we know that this keeps going on and on and you have these progressive changes, so her telling me that this was not acute put me *80 percent into the ball park of radiation change, 20 percent into recurrent cancer."* (N.T. 2/6/2002, pp. 117-18.) (emphasis added)

During the October 1996 appointment, Dr. Creech ordered a mammogram of Mrs. Vallone's right breast, though he also admitted that a mammogram will not necessarily detect a cancerous growth. (N.T. 2/6/2002, p. 105.)

Shortly after the exchange quoted above, Dr. Creech was asked whether he had compared the mammogram he ordered with any earlier mammograms, and the following exchange ensued:

"[By the defendant's counsel]

"Question: Did you review this [October 1996 mammogram] film yourself, Dr. Creech?

"Answer: Yes. . . .

"Question: Now, let me ask you this. Did you take the two films themselves, the mammogram from April of

1996 and the mammogram from November, 1996 and compare them?

"Answer: Absolutely. I always do.

"Question: What did you find?

"Answer: That there was no difference.

"Question: What does that mean to you, clinically?

"Answer: That there was no difference.

"Question: Yeah, but I mean in terms of your differential diagnosis, going into it you just said you're thinking 80 percent radiation changes, 20 percent maybe the cancer is back, what effect, if any, did the fact that you now have these two mammograms, you've compared them and as you've just told us there's no change between the two?

"Answer: I think it changed my opinion to 90 percent radiation, 10 percent recurrence." (N.T. 2/6/2002, pp. 121-22.)

It is thus obvious that Dr. Algazy's conclusion was based upon an incorrect premise—that Dr. Creech never suspected a recurrence of cancer in Mrs. Vallone's right breast at any time before December 1997—when in fact Dr. Creech himself testified that he believed that there was a "10 or 20 percent chance" that the changes in Mrs. Vallone's breast were being caused by a recurrence of cancer, and not by the radiation therapy that had been completed several years previously.

According to the standard of care as described by Dr. Glover—a standard with which Dr. Algazy found no fault—Dr. Creech's belief that cancer was a *possibility* was itself sufficient to *mandate* an immediate biopsy, which Dr. Creech nonetheless failed to order for over a

year. His "wait-and-see" approach to the case will, in all probability, cost Mrs. Vallone more than 20 years of her life.

"[W]hile it is true that the jury does not have to accept as true even uncontradicted evidence, . . . it is also true that, where a jury verdict goes against the overwhelming, uncontradicted testimony, the court may set the verdict aside as being clearly against the weight of the evidence." *Riddle v. Anderson,* 85 Pa. Commw. 271, 276, 481 A.2d 382, 385 (1984).

In this case, it is clear beyond reasonable dispute that the failure of Dr. Creech to order a biopsy of Mrs. Vallone's right breast for approximately fifteen months after first noting changes in it that he *admitted* "could have been" cancerous substantially increased Mrs. Vallone's risk of harm, and decreased her chances of surviving five more years (the standard definition of cancer cure) from perhaps 90 percent to zero.

Under these circumstances, the defense verdict rendered by the jury must yield,[1] and the interests of justice require that I award a new trial.

### 2. A Jury Charge on "Mere Error of Judgment" Was Inappropriate in This Case

Though it is indeed true that a physician may not be held liable for a "mere error in judgment," *Soda v. Baird,*

---

1. I do not lightly disregard a jury's verdict, as I have great faith in the jury system's ability to reach just results, and I firmly believe that juries generally discharge their duties in an admirable manner. A significant flaw in the jury's charge (which would scarcely be the jury's fault) may have contributed to the erroneous verdict, as will be discussed in the next section of this opinion.

411 Pa. Super. 80, 600 A.2d 1274 (1991), such an instruction to the jury is only appropriate in a case where there is at least some question whether the physician's performance breached the standard of care in the first place. "There is no responsibility for error of judgment unless it is so gross as to be inconsistent with the degree of skill which it is the duty of every physician to possess." *Hodgson v. Bigelow,* 335 Pa. 497, 504-505, 7 A.2d 338 (1939).

"[A] physician is not liable for an error of judgment . . . if a physician employs the required judgment and care in arriving at his diagnosis, the mere fact that he erred in his diagnosis will not render him liable, even though his treatment is not proper for the condition that actually exists." *Smith v. Yohe,* 412 Pa. 94, 100, 194 A.2d 167, 171 (1963).

"This is not to say that a physician cannot be liable for a mistake of judgment or misdiagnosis. He is clearly liable if his mistake reflects *a failure to follow proper practice, and thereby violates the standard of care* required of physicians." *Havasy v. Resnick,* 415 Pa. Super. 480, 501, 609 A.2d 1326, 1336 (1992). (emphasis added)

The uncontroverted testimony in this case established that Dr. Creech's failure to order a biopsy for approximately 15 months after Mrs. Vallone presented with changes in her breast, given Dr. Creech's knowledge that a cancerous growth had previously been removed from it, so clearly violated the requisite standard of care that the "mere error of judgment" charge had no place in this trial.

It is quite reasonable to assume that the "mere error of judgment" charge caused the jury considerable confu-

sion; in fact, the jury sent out a number of notes during its deliberations so suggesting, including one note that inquired what would happen if 10 of the 12 jurors could not agree on a verdict.

Though Judge Davis appropriately side-stepped that question, he did—pursuant to a request from the jury—reread the "mere error of judgment" portion of his charge, thereby giving even greater emphasis to the erroneous instruction.

Later that same day, the jury returned its 10-to-2 verdict in favor of the defendant physician.

It is impossible to know with certainty whether or not the erroneous inclusion of a "mere error of judgment" charge directly led to the jury's verdict in favor of the defendant, but in view of the defendant's clear breach of the applicable standard of care, I must assume that this jury was hopelessly confused during its deliberations.

## CONCLUSION

There is no rational explanation for the jury verdict in this case. It cannot be attributed to a mere divergence of opinion among expert witnesses, nor to any legitimate question about the underlying facts of this matter.

For those reasons, as discussed more fully above, my decision to grant a new trial in this case was the only proper result, and my decision must therefore be affirmed.