Roberts *v.* Pitt Publishing Company, Appellant.

Argued March 23, 1938. Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*George Y. Meyer,* with him *Samuel G. Wagner, R. A. Applegate* and *John B. Eichenauer,* of *Rose & Eichenauer,* for appellant.

*Anne X. Alpern,* with her *John F. McDonough,* for appellee.

Opinion by Mr. Justice Schaffer, April 18, 1938:

All who have had to deal with this case, counsel on both sides, trial judge and court in banc, treat it as one of difficulty in seeing that justice is done. To theirs we add our own sense of uncertainty in conclusion. It is a case in which, in order that the evidence be accurately weighed, strict rules must be followed and close reasoning applied.

The perplexity which confronts sureness of determination arises from the circumstance that plaintiff was in two automobile accidents on the same night, in both of which his head was injured. If his injuries can with certainty be ascribed to the first accident, he was entitled to a verdict, because defendant raises no question as to responsibility for the negligent operation of the automobile which caused them. If, on the other hand, there is doubt as to the correctness of the verdict, which may have been caused by mistakes in the admission of testimony and erroneous statements in the court's charge, a new trial should be awarded.

Plaintiff testified on direct examination that in the first accident, which took place about one-thirty in the morning, his automobile was knocked across the street by defendant's automobile, that he was picked up and taken to the hospital and that is all he remembers until three or four days later in the hospital. On cross-examination, he said he believed he got out of his car, but was not sure. On specific inquiry he recalled that he had been in a second collision and that when he left the hospital following the first one, he had signed a release to the hospital. As to this he claimed he did not know what he was doing. He had been taken from the hospital, after declining to stay, by Harrington, a police officer, who transported him from the scene of the first accident. As they were proceeding, and when several

city blocks from the hospital, the policeman driving, they collided with another automobile coming in the opposite direction on the same street. This collision was quite violent, plaintiff being thrown against the windshield of the car, breaking it. He recalled circumstances of this accident when interrogated on cross-examination, but at first said he could not recall hitting the windshield, subsequently he admitted that his nose struck the glass and was bleeding. Upon close inquiry, he said that in the first accident the right side of his head hit the top of the car and had a big lump on it.

Harrington was on the scene of the first accident a second or so after it happened. He saw plaintiff "out on his knees holding his head." He further said, "I seen the condition of him. I just took him under my arm and put him in the machine." Asked what plaintiff's condition was on the road from the scene of the accident to the hospital, he replied, "He didn't know a thing." He went on to testify about taking plaintiff from the hospital, intending to drive him home, and to the fact of the second accident. Asked as to plaintiff's mental condition on the way from the hospital, he said he was not clear mentally, that he did not act right, that he was worried about his wife and family and wanted to go home. This witness did not take plaintiff to the hospital after the second accident. With reference to the violence of the collision, he said the front of his car was caved in and it had to be towed from the scene and that the windshield was broken.

Another policeman, Walsh by name, who arrived at the place of the first collision very shortly after it occurred, describing plaintiff's condition, said that "he was dazed, staggering around there," that in the hospital, "He was talking kind of irrational there and he wanted to go home, but they wanted to detain him. He had a big bump on his head and they wanted to detain him for observation." This witness left the hospital before plaintiff did. A lieutenant of police, who came to

the scene of the second accident, said plaintiff was walking around in circles, that he acted very dazed.

One of the most important witnesses in the case, whose testimony is the center of the main legal problem we are called upon to solve, is Dr. Elizabeth Muth, called by plaintiff. She was an interne in the hospital and saw and cared for him both times he came in. Speaking of the first accident, she related that he entered the hospital about 2:15 in the morning, with a head contusion over his left eye and over the left side of his forehead. *"They had given a history before he came in, that he had been unconscious for awhile, but when he was examined in the emergency room about 2:15, he seemed all right."* She did not state who "they" were. She said that under the hospital rules all head cases should be kept in the hospital until it is ascertained that there is no skull fracture, but plaintiff refused to stay and signed a release and left. About fifteen minutes later he was again admitted and complained of pain in his chest, his nose was bleeding and he was dazed. Interrogated by plaintiff's counsel as to whether on the first accident she received a history of his having been "unconscious for a period of ten minutes" (prior to that she had not fixed a specific time) and replying to the court's interrogation whether he gave the history himself she replied, "The people who brought him in said that, but when he was examined he was fully conscious following the first accident." She stated that X-rays the next morning showed a skull fracture about an inch and a half long. On cross-examination she testified that when plaintiff came in after the first accident he was perfectly conscious and had no symptoms of a fractured skull, that his pupils were equal and reacted to light and his blood pressure was normal, and that with a fractured skull you usually get one pupil dilated and blood pressure not normal. She again stated that he was rational, that she advised him to stay, but he refused. "The first time he came in he seemed perfectly all right. I mean,

he was able to talk perfectly all right. The second time he came in he was not able to talk as well as the first time." She said she was not able to state, from her knowledge of the case and her medical knowledge and experience, which one of the accidents caused the fracture, but that, if it was true as stated by the persons who brought him in after the first accident, that he had been unconscious for ten minutes, he had had a concussion.

In the hypothetical question propounded to the physicians called by plaintiff, it was assumed that this statement of fact that plaintiff was unconscious for ten minutes was true. It should be borne in mind that this was not something which Dr. Muth stated from her own knowledge, but something told to her. It should also be noted that the two policemen who took him to the hospital, when called as witnesses, did not testify that he was unconscious for ten minutes. What Harrington said was, "He didn't know a thing. I seen the condition of him. I just took him under my arm and put him in the machine." Walsh, the other policeman, testified, "He was dazed, staggering around there." Neither of these statements is that plaintiff was unconscious. All of this could be true, and he would not be unconscious, as that expression is commonly understood. While it is true the statement was not objected to when she recited it, the hypothetical questions in which it was embodied were objected to, because they did not contain a correct statement of the facts. If the plaintiff had stated the fact of unconsciousness to the doctor, it could have been used in the hypothetical question, because statements by patient to doctor are a necessary variant of the hearsay rule: *Lichtenwallner v. Laubach,* 105 Pa. 366; *Lake Shore & Mich. Southern R. R. Co. v. Rosenzweig,* 113 Pa. 519, 6 A. 545; *Eby v. Travelers Ins. Co.,* 258 Pa. 525, 102 A. 209; *John v. Reick–McJunkin Dairy Co.,* 281 Pa. 543, 127 A. 143; or, if the testimony given by the two

policemen as to what they observed had been put in the questions, they would have been unobjectionable.

How important a part the statement played in the conclusions of the physicians called by plaintiff, that the skull fracture was due to the first accident, is evidenced, by the fact that one of them said in effect that if he was conscious after the first accident, it would make a difference in his opinion; another, that if it were a fact that plaintiff was not unconscious after the first accident, it might make a difference in his viewpoint. The latter, in answer to the question on cross-examination, whether he was aware of the fact that plaintiff immediately after the first accident was taken to the hospital and there examined and found to be perfectly normal, without any evidence of any kind indicating a fracture, said this would influence his opinion, and upon further inquiry as to whether he would be able to say that his condition as he found it subsequently when he examined him was due to the one accident or the other, answered, "No." A third doctor testified that he could not say that plaintiff had sustained the fracture in the first accident. He went on to say that his conclusion from the history of the case as given in the hypothetical question, embodying the unconscious feature, and as given by plaintiff, was that plaintiff had sustained a concussion of the brain, irrespective of the fracture, in the first accident and that this concussion was responsible for the impaired condition in which he found him. Dr. Swan, called by plaintiff, who attended him in the hospital, who saw him the next morning after the accident, and who received the history, which included unconsciousness after the first accident, stated that he was unable to say which accident was responsible for the fracture, but concluded he was suffering from concussion after the first accident, basing this conclusion upon the statement that he was unconscious for ten minutes following it. He stated on cross-examination that from the examination made when plaintiff entered the hospital after

the first accident, he could not say that he had a·concussion. At the close of plaintiff's case in chief, defendant's counsel moved to strike out that part of the medical testimony to the effect that plaintiff's fracture was the result of the first accident. This motion was refused. The doctors called by defendant were of opinion that the fracture of plaintiff's skull was sustained in the second accident.

When the trial judge charged the jury, he, perhaps unconsciously, magnified and intensified what had been incorporated in the hypothetical question as to plaintiff's unconsciousness, by stating, that the police officer who took plaintiff to the hospital said "he was mumbling and incoherent on his way to the hospital, did not know what happened, did not seem to know what he was talking about." No testimony warranted this statement. He went on to say, "The hospital records show [they were not in evidence] that there is a history that some one had given the information to the person who took the history of the patient, that he had been unconscious for a period of ten minutes following the accident. That is hearsay, and in itself is not evidence. It is only evidence that the physicians may use in diagnosing their patients' case. It is not a fact that would prove anything in this case. If that were in here alone, I mean that entry appearing in the hospital record of a period of unconsciousness, that would not justify your finding that anything serious had happened in the first accident." The trial judge further said: "The physicians, experts testifying on behalf of the plaintiff, testified that in their opinion, taking into consideration the history given to them by the patient and the record of the hospital as part of the history, that if there was a period of unconsciousness following the first accident, that that in their opinion was the accident which caused the serious injury." When the trial judge's attention was called by defendant's counsel to his overstatements of the evidence, instead of telling the jury that he was

mistaken in so stating and what the testimony really was, he simply remarked to them that it was their recollection which should control. When account is taken of the fact that the critical question in the case, on which the opinions of the doctors were based, was whether plaintiff had been rendered unconscious for a period of ten minutes by the first accident, the court's instructions must have left the jury in an uncertain state of mind.

We are of opinion that it was error to permit the hypothetical questions to be addressed to the doctors, with the statement in them that plaintiff had been unconscious after the first accident for a period of ten minutes, because that statement was not based upon a fact related by any witness, but upon the hearsay statement of Dr. Muth; particularly is this so when account is taken of the admission by the physicians that if the factor of unconsciousness was not in the case, they could not say which accident had caused the fracture of plaintiff's skull. The court's charge added undue weight to the improper statement in the questions.

"The general rule is that a hypothetical question should include a full statement of all material facts, if they are uncontradicted, or such facts as the interrogating party may reasonably deem established by the testimony of his witnesses . . . but should not include facts not warranted by the evidence": *Albert v. Phila. R. T. Co.*, 252 Pa. 527, 533, 97 A. 680. "Expert opinion could not be allowed to be expressed upon a state of facts not supported in some measure by the evidence": *Zeigler v. Simplex Found. Co.*, 228 Pa. 64, 67, 77 A. 239. In *Howarth v. Adams Express Co.*, 269 Pa. 280, 283, 112 A. 536, we said: "An expert may express an opinion on an assumed state of facts, which the evidence tends to establish, and not on what someone told him, nor on what he learned from another doctor, nor from the history of the case, we know not what nor by whom communicated. An opinion based on such a question would

naturally be misleading. . . . An expert opinion cannot be based upon facts not before the jury . . . nor upon hearsay." In *McMinis v. Phila. Rapid Transit Co.*, 288 Pa. 377, 382, 135 A. 722, where we were considering a hypothetical question, we announced these rules: "A medical expert may testify as to the symptoms and sensations narrated by the patient, for the purpose of securing a correct diagnosis, . . . and is permitted to give his professional judgment as to effects produced by an accident, based on his own physical examination of the injured party, . . . but not on what others have told him, even though fully advised as to the history of the case."

The case must be retried in order that the professional judgment of the physicians called upon to testify shall be based upon a consideration of plaintiff's condition following the accidents as shown by admitted or properly proven facts.

Judgment reversed and a new trial awarded.