## PETERS v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 6996.

Circuit Court of Appeals, Third Circuit.
Oct. 2, 1939.

Rehearing Denied Oct. 31, 1939.

---

C. H. Welles, 3d, of Welles, Mumford & McGrath, of Scranton, Pa., and A. Greenwald Gearhart, of Stroudsburg, Pa., for appellant.

Edward W. Warren and Walter L. Hill, Sr., of O'Malley, Hill, Harris & Harris, both of Scranton, Pa. (Louis W. Dawson, of New York City, of counsel), for appellee.

Before MARIS, CLARK, and BID-DLE, Circuit Judges.

CLARK, Circuit Judge.

This decision writes finis to a rather protracted litigation. On April 25, 1933, plaintiff-appellant brought suit in the District Court on a life and disability insurance policy, Record No. 6323, March Term 1937. The transcript above referred to reveals what seem to be no less than seven attempts between that time and December 9, 1936, on the part of plaintiff-appellant to state a cause of action (under the rules of civil procedure adopted by the Supreme Court of the United States pursuant to the Act of June 19, 1934, ch. 651, 28 U.S.C.A. §§ 723b, 723c, called a claim for relief, Rule 8(a), 28 U.S.C.A. following section 723c). It was then and is now conceded that the plaintiff failed to keep up his premium payments for the year 1931. He sought then and seeks now to excuse that failure by an assertion of total disability (because of a diseased condition of the heart) coming within the appropriate clause of the policy. In the former proceedings, the question involved was "due proof" of that disability, and in the case at bar the question involved is its very existence. The former proceedings were terminated by an opinion filed September 27, 1937, Peters v. Mutual Life Ins. Co. of New York, 92 F.2d 301, by this court. That opinion reversed the learned district judge's holding that the submission of some form of doctor's certificate must be pleaded as "due proof". Peters v. Mutual Life Ins. Co. of New York, D.C., 17 F.Supp. 246. This opinion affirms the learned district judge's view that he disregarded the law of evidence in originally admitting the only testimony as to disability. It is curious to note, first, plaintiff-appellant after four years first asserted and then withdrew the assertion of an examination for disability by two physicians; second, one of these physicians operated on him for appendicitis prior to the date of the supposed examination and at that time diagnosed a heart lesion (myocarditis) not totally disabling. The action of the learned district judge above referred to came after a jury verdict and, from some references in the record, after a previous trial. The earlier appeal was argued by new and the same counsel now appearing before us.

The plaintiff-insured was at the time of the writing of the policy (1928) only 32 years old. At the time of the claim of disability to excuse lapse he was only 35 years old. He had started his working life as a lineman for a small telephone company, Stroudsburg & Bushkill Telephone Company, and had afterwards received some sort of promotion. We say some sort of promotion because its exact nature appears to be disputed. The plaintiff very naturally accents activity and describes himself as a "trouble-shooter". There is some indication, however, that he was actually manager. In any event, the small branch telephone company was finally absorbed by the Bell System, and his wish to be retained in their employ was not gratified. He has never worked since and interests himself in the management of his six small apartments and in driving one or all of his three cars.

The disability asserted is cardiac neurosis. This disease, according to plaintiff's physician, is functional and not organic. In plain English it is the condition of a person whose nervous system responds unfavorably to the belief (whether true or false) that he has some organic disease of the heart. For some time plaintiff-appellant's expert and the family physician who performed the appendectomy were in agreement about the heart lesion. Later on the

latter changed his diagnosis to the one of cardiac neurosis. This ailment, he says, requires abstention from any sort of gainful occupation.

We think the plaintiff-appellant's legal foundations rest upon the sands of a specious fallacy. He propounds a well recognized exception to the hearsay rule as the reason for ignoring an entirely different precept. One of the encyclopaedias of law states that exception in this language: " * * * the rule is different where the physician testifying bases his opinion upon statements made during the relationship of physician and patient. According to the great weight of authority, the opinion of a physician is not rendered inadmissible by the fact that it is based wholly or in part on statements made to him by the patient, if those statements are made in the course of professional treatment and with a view to effecting a cure or during an examination made for the purposes of treatment and cure. In such cases statements of an injured or diseased person, while not admissible as evidence of the facts stated, may be testified to by the physician to show the basis of his opinion". 20 American Jurisprudence, p. 729. And see also Boyle v. Philadelphia Rapid Transit Co., 286 Pa. 536, 134 A. 446. The exception comes within two (Necessity and Guarantee of Trustworthiness) of Professor Wigmore's sine qua non for dispensing with the hearsay rule, 3 Wigmore on Evidence, 2d Ed., 1923, p. 678, § 1714. Even a rapidly progressing medical science has not yet revealed all that goes on inside of us. The need for help (not testimony) and for falsehood are mutually exclusive. 67 A.L. R. 10; 36 Michigan Law Review 142; 19 Virginia Law Review 416; 3 Idaho Law Journal 82. It does not affirmatively appear that plaintiff consulted the witness Dr. Metzgar for treatment rather than for qualification as an expert. However, that may be inferred from the great number of visits made.

■ A physician is, of course, an expert on disease. As we have just shown, he is permitted a certain evidential latitude in his testimony about disease. That does not alter, however, his status as an expert. By the same token it has no bearing on a fundamental principle underlying all opinion evidence. That principle stems from the concept of the expert's function and has been stated: " * * * supplementing the premises upon which the reasoning of the trier of fact is based with premises obtained from his experiential qualifications thereby endowing the trier of fact with sufficient knowledge to understand the significance of the evidence and to make inferences". Rosenthal, The Development of the Use of Expert Testimony, 2 Law and Contemporary Problems 403. Cf. Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harvard Law Review 40, 50-52.

It is plain that no amount of expertness will enable the jury to accomplish the impossible and draw an inference from an unknown fact. This logical impasse has led to the rule requiring disclosure of the data from which an expert opinion is formed. The text books and law reviews put it this way:

"The expert must give to the jury the facts upon which his opinion is based, so that the court and the jury may determine whether the alleged facts are real and justify his conclusions". Lawson, Exp. & Op. Ev., p. 163.

"If the expert were permitted to express his general views without indicating the facts upon which they are based, he would be usurping the function of the jury for to accept the opinion, the jury must accept as found all the facts underlying it". Steinbrink, The Medical Witness, 6 Brooklyn Law Review 155.

"To admit an expert's unexplained conclusions might in many situations lead to something closely resembling a wager of law". Developments in the Law (Evidence) 46 Harvard Law Review 1138, 1169.

■ In the case at bar, the plaintiff-appellant's expert balked at basing his opinion on certain specific and enumerated symptoms (see Appendix). He then volunteered to and did base it on the medical history of the case. He was not even asked to give that history and his entire opinion becomes therefore clearly inadmissible.

We believe that a more logical argument might have been founded on Professor Wigmore's dissent from the rigid views of a majority of his legal brethren. The learned Professor says:

" * * * But does it follow that, when the opinion comes from the same witness who has received the basis of it by actual observation, those premises must be stated beforehand, hypothetically or otherwise, by him or to him? For example, the physician is asked, 'Did you examine the

body?'; 'Yes'; 'State your opinion of the cause of death.' Is it here necessary that he should first state in detail the facts .of his personal observation, as premises, before he can give his opinion?

"In academic nicety, yes; practically, no; and for the simple reason that on cross-examination each and every detail of the appearance he observed will be brought out and thus associated with his general conclusion as the grounds for it, and the tribunal will understand that the rejection of these data will destroy the validity of his opinion.

"Through failure to perceive this limitation, Courts have sometimes sanctioned the requirement of an advance hypothetical statement even where the expert witness speaks from personal observation.

\* \* \* \* \* \*

"But this fallacy of being too unpractical in forcing the logic of the theory is generally and properly repudiated". 1 Wigmore on Evidence, 2d Ed., § 675, p. 1082, 1083.

Some recent model statutes on the subject of expert testimony have incorporated his views and permit, in the case of an expert having "personal knowledge", the reception of an opinion without the disclosure of its underlying data, leaving the elicitation of those minutiae to the option of the cross-examiner. 38 Columbia Law Review 369, 373-5 (Uniform Expert Testimony Act, Sec. 9); 26 Journal of the American Institute of Criminal Law and Criminology 290, 295 (Statute proposed by American Bar Association Committee on Medico Legal Problems, § 10(3).

Unfortunately for the plaintiff-appellant this logic does not extend to cover the circumstance of the principal case. We are not dealing with personal knowledge of the patient's symptoms (examination) alone, but with personal knowledge of the patient's statement of those symptoms (history) as well. Under the adversary system the failure of a cross-examiner to expose the basis of a physician's opinion may imply an acknowledgment that the underlying data or premises are present and warrant it. This assumes, of course, that there is no other reason for such failure to cross-examine. It is just here, we think, that the distinction between medical examination and medical history exists. As we have seen, the admissibility of the latter depends on a not altogether clearly defined exception to the hearsay rule. 3

Wigmore on Evidence, 2d Ed., § 1720. The cross-examiner's failure to pry into the expert's premises may therefore indicate merely his uncertainty, an uncertainty whose cure by way of charge to the jury would result in confusion and complexity and would defeat Dean Wigmore's conception of practicality. We might add that the history of a disease dependent largely on mental processes is about as far removed from a physician's direct physical examination as could. be conceived.

■■ We may say that the Pennsylvania decisions, by which we are of course bound, seem in no way disposed to assent to the views of the learned Dean. In fact, Howarth v. Adams Express Co., 269 Pa. 280, 112 A. 536, cites the passage in Rogers, Expert Testimony, which begins: "An expert, testifying from personal knowledge, cannot be asked for an opinion ·based on facts which he has not given in evidence". P. 82.

Other Pennsylvania decisions which touch upon the point appear to adopt an equally strict attitude. See Roberts v. Pitt Publishing Co., 330 Pa. 44, 198 A. 668; Rouch v. Zehring, 59 Pa. 74; Becker v. Philadelphia Rapid Transit Co., 245 Pa. 462, 91 A. 861; Williams v. Philadelphia Rapid Transit Co., 257 ·Pa. 354, 101 A. 748; Knisely v. Knisely, 120 Pa.Super. 140, 182 A. 51; Harmon v. Knoll, 129 Pa. Super. 390, 393, 195 A. 448; Johnson v. Valvoline Oil Co., 131 Pa.Super. 266, 200 A. 224.

The judgment n.o.v. of the District Court is affirmed.

## APPENDIX

"Q. Doctor, assuming that in May of 1931 the plaintiff, Harry Peters, suffered from sweating, had a pain in his heart region and which extended up through the left shoulder, down into his arm, had shortness of breath as he has testified, I ask you whether in your opinion he suffered at that time from the heart complaint about which you have testified?

"By Mr. Hill: Objected to.

"By the Court: Over-ruled.

"The Witness: From those factors only I wouldn't be able to express an opinion. However, from the factors he enumerated at the time I first saw him I could.

"By Mr. Hill: We ask that be stricken out. The last part. The first part is responsive". Record 146–7.

"Q. Doctor, I believe you testified that basing your opinion on the examinations you made of Harry Peters and of the history of the case which you got from him, you were able to form a medical opinion as to when his heart condition first began, did you not? A. I did.

"By the Court: Wait a minute, Doctor. Did you answer yes? A. I did, yes.

"Q. Now, Doctor, will you state your professional opinion as to when it did begin?

"By Mr. Hill: That is objected to, your Honor, because the witness has not shown proper basis for such an opinion.

"By the Court: Over-ruled. Let him answer the question. You can move to strike it out later.

"The Witness: At least two years prior to my first visit in July, 1932.

"By Mr. Hill: We ask that that be stricken out.

"By the Court: Over-ruled for the present." Record 148–9.