# Happel v. Johnson

*Malos, Baurkot & Baratta,* for plaintiffs.
*Edward Feege* and *John Hambrook,* for defendant.

PER CURIAM, December 26, 1972.—This matter is before the court on defendant's motion for judgment n. o. v. and, in the alternative, for a new trial.

Suit was begun by plaintiffs on July 11, 1966, charg-

ing defendant with medical malpractice in three counts: (1) Negligence in the diagnosis and treatment of plaintiff, Gloria Happel, in failing to take necessary diagnostic tests and administering conservative treatment; (2) breach of an agreement to perform in conformity with the skill and knowledge usually possessed by physicians of good standing in the same or similar locality; and (3) failure to receive plaintiffs' informed consent for the performance of a coccygectomy. The jury found for plaintiffs on the first count and for defendant on the second and third counts, and awarded verdicts of $175,000 to plaintiff, Gloria Happel, and $25,000 to plaintiff, Darwyn Happel.

Briefly, the facts of the case are as follows:

On February 18, 1962, plaintiff, Gloria Happel, was referred to Dr. Rolf Johnson, an orthopedic surgeon, for diagnosis and treatment of pain in the lower spine, which pain was produced only when Mrs. Happel sat or rose from a sitting position. On that date, Dr. Johnson performed an external examination and manipulation of Mrs. Happel's coccyx, or tailbone, and diagnosed her condition as undifferentiated coccydynia, or pain in the coccyx. Dr. Johnson prescribed an anti-inflammatory drug, which failed to provide any relief.

On April 29, 1963, Dr. Johnson performed another external examination and manipulation of Mrs. Happel's coccyx, and injected the area with a local anesthetic, which also proved unavailing. Dr. Johson testified that both he and the referring physician had prescribed various modes of conservative therapy for about 10 months prior to that date. Both plaintiffs testified to the contrary.

Based on the February 18th and April 29th examinations, and on the failure of the allegedly prescribed conservative therapy, Dr. Johnson recommended a

coccygectomy, or removal of the coccyx, a recognized method of treatment of coccydynia.

On October 31, 1963, the coccygectomy was performed by Dr. Johnson. Subsequently, Mrs. Happel began to experience constant and severe pain in the area of the operation. She continued to consult Dr. Johnson periodically from the date of the operation until March 2, 1964. During that period she was advised that the probable cause of her increased pain was postoperative scarring and that the pain would eventually abate. From March 2, 1964, until September 4, 1964, it appears that there was no contact between Mrs. Happel and Dr. Johnson, although during that period Dr. Johnson had not released Mrs. Happel from his care.

On September 4, 1964, the Happels again consulted Dr. Johnson at his office. The testimony relating to this last consultation is uncertain. Both Darwyn and Gloria Happel testified that they were unable to recall any specific details concerning services performed by Dr. Johnson on that date. Dr. Johnson, on pretrial deposition, testified that he had made a limited examination on that date. At trial, he first testified that although he could not recall any details of the examination, he must have examined Mrs. Happel because he so testified in his deposition. However, he later testified that his prior testimony was incorrect and that he had not been able to examine Mrs. Happel on September 4, 1964. The only fact which appears with any certainty is that the Happels, having become dissatisfied with Dr. Johnson's explanations of Mrs. Happel's constant and severe pain, dismissed Dr. Johnson as Mrs. Happel's physician.

Subsequently, Mrs. Happel underwent a series of exploratory and diagnostic surgical operations on her spine at University of Pennsylvania Hospital, Mayo

Clinic and St. Luke's Hospital, in an attempt to alleviate her back pain.

The testimony of Darwyn and Gloria Happel and Dr. Norman Hoover, plaintiffs' medical expert, concerning the extent and effect of Mrs. Happel's pain, may be summarized as follows:

Prior to October 31, 1963, Mrs. Happel's pain was mild and produced only by sitting and rising from a sitting position. After the coccygectomy, the pain became constant, severe, and so debilitating as to prevent her from further enjoying any normal life style. Dr. Hoover also testified that the prognosis of Mrs. Happel's condition is dim and that she will continue to suffer severe pain throughout her life.

Dr. Hoover further testified that the competent producing cause of Mrs. Happel's continued pain is aggravation of pre-existing spasm in the muscles of the pelvic floor by pain and tenderness in the surgical scar produced by the coccygectomy. He also testified that the preoperative pain caused by the spasm, plus the pain from the postoperative scarring, have combined to produce increased spasm, which, in turn, generates greater pain. He testified that had the coccyx not been removed, there would be no surgical scar, and that but for the scar, the spasm could be relieved by massage.

Dr. Hoover assessed Dr. Johnson's alleged negligence in failing to conform to minimum professional standards in the examination, diagnosis and treatment of Mrs. Happel as follows:

Dr. Johnson failed to make a proper preoperative examination, particularly a digital examination of the pelvic floor muscles through the rectum. Had he performed a digital rectal examination, he would have discovered the cause of Mrs. Happel's coccygeal pain to be spasm in the pelvic floor muscles. With that diag-

nosis, conservative treatment, including rectal massage and heat treatments, would have obviated the necessity of removing the coccyx.

Dr. Hoover did not criticize the actual surgical technique of the coccygectomy. He also testified that neither the subsequent operations performed on Mrs. Happel, nor pathological conditions revealed thereby, were causally related to Mrs. Happel's pain.

Dr. Johnson answered Dr. Hoover's contentions with the contention that his management of Mrs. Happel did not depart from good and accepted medical standards. In support thereof, Dr. Johnson produced the testimony of several expert witnesses, including himself. That testimony, if believed, tended to prove that (1) Dr. Johnson's management of Mrs. Happel was within accepted medical standards; (2) the series of subsequent operations undergone by Mrs. Happel have made it impossible to ascertain the proximate cause of Mrs. Happel's present pain with any degree of certainty; and/or (3) Dr. Johnson's failure to perform a digital rectal examination is not causally connected with Mrs. Happel's present pain.

Dr. Eugene DiSalvo testified that no diagnostic tests are done as a matter of rote or ritual; that a digital rectal examination is a test of very limited value, the failure to perform which is not a departure from good and accepted medical practice in the diagnosis of coccydynia; that such an examination itself can cause muscle spasm; that as much diagnostic information can be obtained by external examination and manipulation, as performed by Dr. Johnson; and that rectal massage is not ordinarily used as a mode of treatment by orthopedists.

Dr. Irwin Schmidt testified that selections of particular diagnostic tests are made by a physician on the basis of the physician's own experience; that in

his opinion, a digital rectal examination of the coccyx generally is necessary to a diagnosis of coccydynia in accordance with good and accepted medical standards; but that Dr. Johnson's failure to do so in this particular case is not causally connected to Mrs. Happel's present condition; and that orthopedists do not generally employ rectal massage to treat coccydynia.

Dr. Johnson himself testified that, on neither of his preoperative examinations of Mrs. Happel did he discover any spasm in the pelvic floor muscles.

Before proceeding, it is first necessary to note that "in considering a Motion for Judgment N.O.V., the evidence, together with all reasonable inferences therefrom, is considered in the light most favorable to the verdict winner": Lewis v. United States Rubber Company, 414 Pa. 626, 202 A. 2d 20 (1964); Pritts v. Wigle, 414 Pa. 309, 200 A. 2d 386 (1964); Connolly v. Philadelphia Transportation Co., 420 Pa. 280, 216 A. 2d 60 (1966). This same principle is also applied to a motion for a new trial: Sharble et al. v. Kuehnle-Wilson, Inc., 359 Pa. 494, 59 A. 2d 58 (1948).

I. *Motion for judgment n. o. v.*

In support of his motion for judgment n.o.v., defendant has assigned the following reasons:

1. The instant action was not brought in the period required by the Statute of Limitations.

2. There was such an obvious contradiction in plaintiff's evidence with respect to the diagnostic tests required in the treatment of the wife-plaintiff that the trial judge should not have submitted the issue to the jury and permitted them to speculate as to defendant's liability.

3. All of the evidence in the case showed at most a mistake in diagnosis where the symptoms were obscure for which defendant cannot be held liable.

4. All of the evidence in this case showed that there is competent medical authority, although divided, subscribed to by reputable, respectable and reasonable medical experts, with respect to the diagnostic tests required in the case such as presented by the wife-plaintiff to defendant; and, in view of the conflicting reliable expert evidence as to what was the proper course to be pursued by defendant in this case, the matter should not have been submitted to the jury.

## STATUTE OF LIMITATIONS

The statute of limitations applicable to actions involving personal injuries is set forth in the Act of June 24, 1895, P. L. 236, sec. 2, 12 PS §34, which provides:

"Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards."

However, over the years there have arisen several exceptions which have the effect of tolling the statute, allowing an injured party to bring his suit even after the two-year period prescribed. "If through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of injury, the defendant is estopped from invoking the bar of the limitation of the action." See Plazak v. Allegheny Steel Company, 324 Pa. 422, 188 Atl. 130 (1936); Deemer v. Weaver, 324 Pa. 85, 187 Atl. 215 (1936). Further, "the fraud which will toll the statute and effect an estoppel need not be fraud in the strictest sense, i.e., inclusive of an intent to deceive, but may be fraud in the broad sense, i.e., inclusive of an *unintentional* deception": Walters v. Ditzler, 424 Pa. 445, 227 A. 2d 833 (1967); Nesbitt v. Erie Coach Company, 416 Pa. 89, 204 A. 2d 473 (1964). (Italics supplied.)

What is involved herein is exactly that type of unintentional deception which results from a physician's continuous treatment of a patient. One, untrained in the healing arts, puts herself in the care of a highly skilled professional. As part of the prescribed process, the physician operates, removing a part of her spine, and then, postoperatively, continues to treat her, reassuring her that the increasing pain is normal and will, eventually, abate. The patient, having no reason to disbelieve the representations of her doctor, continues to follow his advice and mode of treatment. Obviously, plaintiff acted reasonably in listening to her physician, although suffering from pain which she was assured followed all such operations. It cannot be reasonably denied that her suspicions were assuaged and her guard lowered by what she considered to be the superior knowledge and experience of her doctor. Therein lies the "unintentional deception" which tolls the running of the statute of limitations.

The other question involving the statute of limitations relates to the last date treatment was rendered plaintiff. The coccygectomy was performed on October 31, 1963. From that date until March 2, 1964, according to the testimony, defendant continued treating plaintiff, assuring her that the pain she experienced would eventually abate. A dispute arises in relation to the events on September 4, 1964, the date on which plaintiffs dismissed Dr. Johnson as Mrs. Happel's physician. The question concerns what treatment, if any, was rendered Mrs. Happel on that date and is important because, notwithstanding the reliance on their doctor's assurances, if it were found that the last date of effectual treatment was March 2, 1964, the last day under the statute would have been two years from that date. Plaintiffs would be barred from bringing this action since they started their suit on July 11,

1966, over four months beyond the two-year period. The rule herein involved is that "when the facts are in doubt or dispute, the question of whether an action is barred by the Statute of Limitations is one of fact to be determined by the jury"[1]: 22 P.L.Encyc. Limita-

---

1. The charge to the jury, herein, was as follows:

"There is another phase of this case that I must charge you on, again, another technical part of it. The defendant in this case has raised the defense of the statute of limitations. There is a statute in Pennsylvania, or a rule of law, that says that in this type of action, the person who was injured must bring his action within two years of the date of the injury and not thereafter. The defendant points out that the last act which Dr. Johnson did in this case was on March 2, 1964. That, at least, was the last office visit during which Dr. Johnson was able to examine Mrs. Happel, and that was on March 2, 1964. There was also an office visit in September of 1964 concerning which there is much testimony and I remind you and direct that you recall it, that Dr. Johnson may or may not have made an examination of Mrs. Happel. After the visit in September of 1964, Mr. and Mrs. Happel no longer went back to Dr. Johnson's office for medical treatment. Mrs. Happel's coccygectomy, the removal of her coccyx, took place October 31, 1963, some time before this last visit. It is for you to recollect what the status of the physician-patient relationship between Dr. Johnson and Mrs. Happel was during this period.

"The defendant points out that the last real office visit was on March 2, 1964. The operation was on October 31, 1963, and that it was more than two years after the operation and the March office visit that this suit was brought. This suit was brought on July 11, 1966. Now, it is more than two years from March 2, 1964, to July 11, 1966. It is a little over four months more than two years between those dates. It is less than two years, however, from the September office visit.

"The application of this statute of limitations is not simple. The statute in Pennsylvania commences to run, that is, the running of the two year period begins not when the act was done, not the date that the operation was done, but when the alleged act resulted in injury to the plaintiff and in an action of this type, in malpractice cases, the statute begins to run, the two year period begins to be ticked off, when the date of that discovery of that

tion of Actions, §157 (and cases cited). It is evident that "[t]he jury by its verdict unquestionably concluded that the plaintiff had not unduly rested on his rights too long": Chittenholm v. Giffin, 361 Pa. 454, 65 A. 2d 371 (1949).

## CONTRADICTION IN PLAINTIFFS' TESTIMONY RE DIAGNOSTIC TESTS

Defendant contends that there was so obvious a contradiction in plaintiffs' own evidence regarding what diagnostic tests should have been performed by Dr. Johnson that it was impermissible to allow the jury to speculate as to a matter on which plaintiffs had the burden of proof.[2] Defendant argues that the contradiction exists by virtue of the fact that plaintiffs called Dr. Johnson without specifically stating on the record

---

harm or from the date when the plaintiff, as a reasonable person, ought to have discovered the injury which resulted from the negligent act, whichever is the earlier date.

"The plaintiffs, Mr. and Mrs. Happel, contend that they were justified in waiting until July 11, 1966, because they did not discover the alleged negligence of Dr. Johnson and the injury to Mrs. Happel until after July 11 of 1964; and that they could not reasonably be expected in this case, to have discovered the problem before July 11, 1964. Therefore, they contend they were within their rights in beginning this suit on July 11, 1966.

"This raises a question of fact for you, the jury, to consider and that question is whether this action, brought on July 11, 1966, was brought within two years of the date of the discovery of the negligent act, if you find it to be negligent, and the harm which resulted from it, were within two years from the date when the plaintiff, as a reasonable person, should have discovered it.

"It is up to you to determine whether the action was brought within two years of the last act, and it is up to you to determine what that last act was; and it is a question of fact for you to determine."

2. See, e.g., Thomas v. Ribble, 404 Pa. 296, 172 A.2d 280 (1961); Musleva v. Patton Clay Manufacturing Co., 338 Pa. 249, 12 A.2d 554 (1940).

that he was called as on cross-examination. Defendant concludes, therefore, that Dr. Johnson became plaintiffs' witness, whose testimony regarding diagnostic tests was specifically contradicted by the testimony of plaintiffs' medical expert, Dr. Hoover. We find no merit in this position.

A review of the examination of Dr. Johnson, conducted by plaintiffs' counsel, clearly indicates that it was in the nature of cross-examination. Plaintiffs' counsel repeatedly posed leading questions without objection from defendant's counsel. Under such circumstances, penalizing plaintiffs for failing to use the magic words "as on cross" would amount to an unwarranted elevation of form over substance.

It is only where testimony elicited from examination as on cross goes uncontradicted that the examining party is concluded thereby: Conley v. Mervis, 324 Pa. 577, 188 Atl. 350 (1936); Becker v. Saylor, 317 Pa. 573, 177 Atl. 804 (1935). That is not the case here, as is evident from a review of Dr. Hoover's testimony.

### MISTAKE IN DIAGNOSIS WHERE SYMPTOMS ARE OBSCURE

Defendant next contends that the most plaintiffs have proven is that Dr. Johnson made a mistake in diagnosis where the symptoms were obscure. The law imposes no liability for mere errors of judgment in diagnosis where symptoms are obscure.[3] However, that principle is not controlling in the present matter.

The "no liability" principle in question first requires that a medically acceptable clinical examination be performed. If, on the basis of such an examination, the physician merely errs in interpreting his findings,

---

3. See, e.g., Smith v. Yohe, 412 Pa. 94, 194 A.2d 167 (1963); Hodgson v. Bigelow, 335 Pa. 497, 7 A.2d 338 (1939); Duckworth v. Bennett, 320 Pa. 47, 181 Atl. 558 (1935).

then no liability may be assessed against him for his mistake. In the present matter, however, there is conflicting testimony as to whether a proper diagnostic examination was ever performed by Dr. Johnson. Dr. Hoover testified that Dr. Johnson failed to conduct an acceptable examination of Mrs. Happel. Dr. Johnson and his medical experts testified that his examination was proper. There was, therefore, a question of fact for the jury to resolve.

Further, the "no liability" principle assumes that the findings from a diagnostic examination are obscure, or susceptible of multiple interpretations. Here, both Dr. Hoover and Dr. Johnson testified that their respective findings, relative to Mrs. Happel's preoperative pain, were clear and unequivocal. There is, then, no evidence which would justify any inference that her symptoms were obscure. Rather, the focus of the conflict is whether Mrs. Happel was suffering from preoperative spasm of the pelvic floor muscles and, what diagnostic tests were required to discover the presence or absence of such spasm.

## DIVIDED MEDICAL AUTHORITY RE COURSE OF DIAGNOSIS AND TREATMENT

Defendant's final contention in support of the motion for judgment n. o. v. is that among orthopedic surgeons, of ordinary skill and learning, more than one method of treatment is recognized as proper in the treatment of coccydynia and, therefore, it was not for the jury to decide which mode of treatment was the better one.[4] While we take no issue with the abstract legal principle involved, it is not controlling under the testimony adduced in this case. A review

4. See, e.g., Collins v. Hand, 431 Pa. 378, 246 A.2d 398 (1968); Hodgson v. Bigelow, supra; Remley v. Plummer, 79 Pa. Superior Ct. 117 (1922).

of the record demonstrates that more is at issue than the propriety of two recognized modes of diagnosis and treatment.

The primary issue of fact was whether Mrs. Happel's preoperative pain was caused by muscle spasm, as testified by Dr. Hoover, or whether there was an absence of muscle spasm and the preoperative pain was caused by an anteversion, or tilting forward, of the coccyx, as testified by Dr. Johnson. The issue of what mode of diagnostic treatment should have been followed to properly ascertain the presence or absence of muscle spasm was subordinate to that primary inquiry; a determination that preoperative spasm did exist necessarily implies that Dr. Johnson's diagnostic examination was medically insufficient, since he himself testified he found no muscle spasm. Under these circumstances, we find that a prima facie case for the jury was established under the authority of Hodgson v. Bigelow, supra, note 4.

## II.  Motion for a New Trial

In support of his motion for a new trial, defendant has assigned the following specific errors:

1.  Whether the learned trial judge erred in foreclosing cross-examination of plaintiff, Gloria Happel.

2.  Whether the learned trial judge erred in charging the jury re the tolling of the statute of limitations.

3.  Whether the learned trial judge erred in refusing to permit cross-examination of Dr. William Hoover concerning his knowledge of the skill and knowledge normally possessed by orthopedic surgeons in this or similar communities.

4.  Whether the learned trial judge erred in allowing an improper hypothetical question.

5.  Whether the learned trial judge erred in admitting into evidence all hospital records concerning wife-plaintiff's subsequent hospitalizations.

6. Whether the learned trial judge erred in refusing to allow Dr. David Eaton to testify on behalf of defendant.

7. Whether the learned trial judge erred in allowing Dr. Charles Iobst to testify that the subsequent hospital expenses incurred by plaintiffs were necessary and related to the harm suffered as a result of defendant's operation.

8. Whether the learned trial judge erred in allowing plaintiffs' counsel to make certain statements in his closing speech regarding computation of damages.

Defendant has also moved for a new trial on the ground that he was deprived of his opportunity to exercise his peremptory challenges to the jury as a result of the failure of one of the members of the prospective jury to truthfully answer questions propounded on voir dire.

## DEPRIVATION OF OPPORTUNITY TO EXERCISE PEREMPTORY CHALLENGE

During the course of the voir dire, one of the questions asked of the prospective jurors was, whether they, or members of their families, had ever been treated by Dr. Johnson or his associates. One of the jurors, Homer McPeek, failed to respond affirmatively to that question. After the trial, defendant, upon a closer examination of his own patient records, discovered that McPeek had consulted Dr. Eugene DiSalvo and that members of McPeek's family had been treated by Dr. Johnson or his associates. Subsequently, a hearing was held before the trial judge, at which time McPeek was required to testify concerning his relationship with those doctors, and his knowledge of them at the time of the voir dire. Defendant makes no claim that McPeek either was biased or that he concealed his relationships with Dr. Johnson and his associates during the voir dire. A review of McPeek's testimony indicates that dur-

ing the voir dire, he did not remember, or even know of, the relationships and, at any rate, his decision in the case was not influenced by them.

Defendant now argues that, even in the absence of a showing of prejudice, he would have challenged McPeek peremptorily had he known of the McPeek family contacts with the doctors; and the deprivation of an opportunity to intelligently exercise the peremptory challenge constitutes grounds for a new trial.

What defendant fails to note, however, is that this information was, at all times, available to him and it was through his own lack of diligence that it failed to come to his attention.[5]

---

5. "Q. Were you present in the courtroom during the selection of the jury?

"A. Yes, sir.

"Q. Were you identified as to being the doctor in that case prior to the selection of the jury?

"A. Yes, sir.

"Q. Now, Doctor, I would like to take you back to some time prior to the beginning of the trial. Prior to October 12, would you tell us what if anything you received from me by way of a prospective jury panel?

"A. You sent me a list of the prospective jury panel.

"Q. And, Doctor, what did you do with that list?

"A. I gave it to one of our secretaries and told her to check it over and see if any of them had been any of my patients or any of the other patients—or the other doctors' patients.

"Q. What secretary was that, Doctor?

"A. Mrs. Stauffer.

"Q. And, Doctor, did she do the work as you requested?

"MR. MALOS: Now, if your Honor please, this has to be a conclusion.

"MR. STETTZ: I withdraw the question.

"Q. As a result of your directions, what if anything did you learn concerning the prospective jury panel?

"MR. MALOS: Now, your Honor, please, this also calls for a conclusion and information gotten from somebody else.

"THE COURT: The objection is overruled.

In support of the above position, defendant cites the case of Commonwealth v. Rosario, 198 Pa. Superior Ct. 177, 182 A. 2d 75 (1962). The Rosario court held that in *criminal proceedings* the failure of jurors

"A. She gave me a—the list back and it indicated which of the jurors had been seen by myself or one of the other doctors.

"Q. Doctor, was the name of Homer McPeek listed as a juror?

"A. No, sir.

"Q. Excuse me, as a prior patient?

"A. No, sir.

"Q. Doctor, what did you do with that list then?

"A. I sent it back to you.

"Q. Now, Doctor, during the course of the trial, did you have any knowledge that—strike that. Doctor, subsequent to the trial, a jury was—a jury rendered a verdict. Is that correct?

"A. Yes, sir.

"Q. Doctor, would you tell us, as it related to the particular jury panel, what occurred after the jury verdict?

"A. Well, the trial was over.

"MR. MALOS: If your Honor please, I don't understand the scope of that question. It is just too broad, what occurred after the trial as it related to the panel.

"THE COURT: Well, let us see what the answer is like. Where it's going to go, I do not know.

"A. I—the trial was over on a Friday and over the weekend, I was thinking it over and the juror number one, as the trial had progressed, began to look familiar to me. So I requested from your office a list of the jury. I didn't have a list of the jury.

"Then I spoke to Mrs. Stauffer and asked her how she checked the file. Well, we have an active file upstairs and then an inactive file downstairs; and she only checked the active file. She didn't check the inactive file. So then I gave her the list and told her to check the inactive file, which we did and we found that Mr. Mc-Peek had been a patient of ours.

"THE COURT: Now, at that point, I ought to rule on the objection.

"The objection is overruled.

"BY MR. STETTZ:

"Q. Now, Dr. Johnson, you said juror number one.

"Who is juror number one, do you know?

"A. Homer McPeek."

to give correct answers to voir dire questions warrants the granting of a new trial even absent any showing of intent to deceive defendant's counsel in the selection of a jury. Whatever the merits of Rosario might be in criminal prosecutions, that holding is not controlling in civil actions. The rule in civil actions is that where, as here, a juror has failed to give correct answers to voir dire questions, no grounds for a new trial exist absent a showing of intent to mislead or deceive the moving party; an after-discovered relationship in itself is no reason for setting aside a verdict: Romesburg v. Merrill, 99 Pa. Superior Ct. 197 (1930). The Romesburg rule has been cited with approval in many subsequent cases.

## FORECLOSING CROSS-EXAMINATION OF GLORIA HAPPEL

In cross-examining Gloria Happel, defendant's counsel inquired specifically as to which doctors left her with the impression that malpractice was involved in Dr. Johnson's coccygectomy. An objection was raised by plaintiffs' counsel. The rulings relative to this line of questioning were as follows:

"BY THE COURT: In that form I think the objection is well taken.

"Now, let me say, too, I think the question would be perfectly permissible if the word 'malpractice' were not in there, and the question whether—that the coccyx should not have been removed . . .

"MR. GLASER: Isn't that the same thing? What difference whether you call it malpractice or not?

"BY THE COURT: Here's the reason that I would permit that: because there is a pleading where she alleges improper removal herself, and she can make those allegations on information given to her.

"BY THE COURT: I'll permit the question as far as the removal is concerned, and her answer to that.

"Now, as to the specific doctors who did or didn't, I'm very reluctant to do it.

"MR. STETTZ: I'll withdraw it. I think I've got enough in on it anyway.

"BY THE COURT: The question is withdrawn.

"MR. GLASER: Will you ask the jury to disregard?

"BY THE COURT: The question is withdrawn, and the court is not ruling on the objection. The jury is directed to disregard the question."

Defendant now contends that since the learned trial judge indicated he would sustain an objection to a question referring to "malpractice" and/or specific doctors, defendant was prejudicially foreclosed from proper inquiry concerning the time from which the statute of limitations should have run. We find no merit in this contention.

It is obvious from the foregoing sequence of rulings that the learned trial judge did not "cut off" defense counsel's inquiry, but, in effect, overruled the objection of plaintiffs' counsel and allowed the inquiry to proceed. The relevant area of inquiry, for statute of limitations purposes, was at what point in time any representations were made to Mrs. Happel concerning the advisability of removing her coccyx. Defendant's counsel voluntarily abandoned his inquiry into that area and cannot now complain that he was precluded by the court.

Furthermore, under the facts of this case, the most remote point in time from which the statute of limitations could have run was September 4, 1964. Since Mrs. Happel, prior to the inquiry in question, testified that she saw no doctor other than Dr. Johnson from October 31, 1963, to September 4, 1964, if defendant's

counsel had elicited testimony that a particular doctor advised plaintiffs of malpractice, the effect would have been to support plaintiffs' position. Consequently, if there was any error, it weighed in defendant's favor.

## CHARGE RE TOLLING OF STATUTE OF LIMITATIONS

Defendant contends that the learned trial judge erred in failing to charge the jury that it was plaintiffs' burden to prove, by clear and convincing evidence, the existence of fraud so as to estop defendant from asserting the bar of the statute. However, it was not the court which was remiss for "[i]f counsel after listening to a charge believes that something more should be said in regard to the testimony of certain witnesses, it is counsel's duty to request the trial judge so to amplify its charge as to cure the inadequacy": Voitasefski v. Pittsburgh Railways Company, 363 Pa. 220, 69 A.2d 370 (1949). Moreover, the law of the Commonwealth has been long established that where defendant tenders no special requests for charge, as in the case at bar, nor excepts specially to the instructions, an appellate court will not reverse on an assignment of error which amounts to no more than a mere inadequacy: Hunter v. Bremer, 256 Pa. 257, 100 Atl. 809 (1917).

## REFUSAL TO ALLOW CROSS-EXAMINATION OF DR. HOOVER RE KNOWLEDGE OF STANDARDS OF MEDICAL PRACTICE

At trial, the learned trial judge indicated that, in his opinion, the "Locality Rule" is dead in Pennsylvania and, on that basis, precluded cross-examination of Dr. Hoover concerning his familiarity of the skill and knowledge normally possessed by orthopedic

surgeons in this and similar communities. Defendant contends this was error.

The Supreme Court of Pennsylvania in Hodgson v. Bigelow, 335 Pa. 497, supra, at pages 509 and 510, has said this about the "Rule":

" 'It is not the law that defendants' conduct of the case is to be judged by the degree of skill and care exercised by other physicians in the same village . . . The locality in which the physician or surgeon practices must be considered in determining whether he has the requisite skill and learning, but we do not think that he is bound to possess and exercise only that degree of skill and learning possessed by other practitioners in the same locality, if by that is meant the same village or city. If the same general locality is meant, as, for instance, the Northwest, or the state, no fault could be found with such a rule.' "

The continuing validity of any geographic limitation on the required standard of medical practice has not lately been considered by the court. The most recent pronouncement of the court was that it declined to comment on whether any such limitation should be continued: Incollingo v. Ewing, 444 Pa. 263, 276, at footnote 6, 282 A.2d 206 (1971). However, the court, in both Donaldson v. Maffucci[6] and Incollingo, appears to have restricted the application of the limitation to nonspecialists. Furthermore, the court stated in both cases that adherence to a norm of treatment in a particular locality is not the test for malpractice where the norm falls below the care and judgment of a reasonable man. The implication that the "Locality Rule" is no longer a viable concept, at least as applied to medical specialists such as orthopedic surgeons, seems a logical extension of the expanded concept of "community" in Hodgson v. Bigelow, supra.

6. 397 Pa. 548, 156 A.2d 835 (1959).

In the present matter, Dr. Johnson testified that he is a Diplomate of the American Board of Orthopedics. In order to obtain a certification as a diplomate from that board, a physician must pass an examination which is uniform throughout the United States. Defendant's own professional society, then, has established for its members a uniform standard of professional conduct. Further, Dr. Irwin Schmidt gave uncontradicted testimony that the standard of practice in the Easton area is the same as in Philadelphia. It would appear, therefore, that the standard of practice in the Easton area, and similar communities, is the same as in major urban communities.

Under the foregoing authorities and circumstances, we think that the necessity of inquiring into Dr. Hoover's knowledge of standards of practice was obviated, and the learned trial judge was correct in refusing to allow cross-examination on that subject.

## PROPRIETY OF PLAINTIFFS' HYPOTHETICAL QUESTION

Defendant contends that the learned trial judge erred in admitting plaintiffs" hypothetical question into evidence over objection.

Counsel for defendant has analyzed the hypothetical question at great length and has assigned a multitude of reasons why the question was improper. Those reasons may be distilled into three general categories: (1) Omissions of material facts; (2) misstatements of fact; and (3) lack of supportive evidence or inference. Defendant further contends that the question was confusing and unintelligible not only because of those reasons, but also because of its length. Therefore, defendant argues that the question violated the exem-

plary teachings of such cases as Collins v. Hand;[7] Murray v. Siegal;[8] McGarity v. New York Life Insurance Co.,[9] and numerous others. We disagree.

We dispose of defendant's contentions regarding misstatements of fact and lack of supportive testimony simply by saying that our reading of the record does not justify those conclusions. We find, rather, that the hypothetical question was based upon facts, either specifically adduced or upon assumptions fairly deducible therefrom.

As to the alleged omissions of material fact, the rule is that a hypothetical question need not encompass the assertions of both the proposing and the opposing parties: Battistone v. Benedetti, 385 Pa. 163, 122 A.2d 536 (1956). Neither party is required to include in the hypothetical question any other facts than those which he may reasonably deem established by the evidence: Battistone v. Benedetti, supra, at 122 A.2d 539, citing Gillman v. Media, Middletown, Aston & Chester Electric Railway Co., 224 Pa. 267, 73 Atl. 342, 344 (1909). A hypothetical question is required to contain a full statement of all material facts only if they are uncontradicted: Karavas v. Poulos, 381 Pa. 358, 113 A.2d 300 (1955); Roberts v. Pitt Publishing Co., 330 Pa. 44, 198 Atl. 668 (1938). Our reading of the record indicates that all of the alleged omissions of material fact were on contradicted issues.

Lastly, defendant urges that the hypothetical question was unintelligible because of excessive length. We are aware of no principle which makes length a determinant of comprehensibility. The length of a hypothetical question is necessarily defined by the nature and volume of testimony adduced.

---

7. 431 Pa. 378, supra, syllabus note 4.

8. 413 Pa. 23, 195 A.2d 790 (1963).

9. 359 Pa. 308, 59 A.2d 47 (1948).

## PROPRIETY OF ADMISSION INTO EVIDENCE OF PLAINTIFF'S HOSPITAL RECORDS

Defendant contends that he was prejudiced by the learned trial judge's erroneous admission into evidence of all of Mrs. Happel's medical records concerning her hospitalizations subsequent to the coccygectomy. He alleges error in that records were irrelevant and not properly qualified. The allegations of irrelevency and prejudice are closely interrelated.

Defendant maintains that because Dr. Hoover stated that the conditions for which Mrs. Happel was treated during the subsequent hospitalizations were not related to the coccydynia, treated by defendant, the records were irrelevant to plaintiffs' case; therefore, the only reason for offering the records was to improperly influence the jury regarding the amount of suffering Mrs. Happel had undergone. We disagree.

In the first place, defendant's argument misstates the testimony of Dr. Hoover. Dr. Hoover testified only that various conditions, discovered during the subsequent hospitalizations, were not causally related to Mrs. Happel's coccygeal pain. He never testified that the subsequent hospitalizations were unrelated to the determination of the cause of Mrs. Happel's postoperative pain. Furthermore, Dr. Charles Iobst, defendant's own witness, testified that all of the subsequent hospitalizations were reasonable and necessary for examination and treatment of that pain.

Secondly, the contention that the only purpose of the hospital records was to influence the jury concerning Mrs. Happel's suffering is wholly without merit. The records were material to proving both special medical damages and the nature and duration of Mrs. Happel's postoperative pain. Further, we find that any additional information contained in the records could not have prejudiced defendant's case.

Since we have found that defendant was not prejudiced by the admission of the records, his contention concerning lack of qualifying evidence becomes moot. Assuming, arguendo, that the alleged deficiency existed, the error in admitting the records into evidence was, in light of their contents, harmless.

## REFUSAL TO PERMIT DR. EATON'S TESTIMONY

During the course of the trial, defendant requested leave to call Dr. David Eaton. Because Dr. Eaton was not listed as a witness during any pretrial conferences, and because plaintiffs were not given notice of defendant's intention to call him at least 10 days prior to trial, the learned trial judge denied the request. The basis for this was this court's strict policy of adherence to its 10-day rule of exclusion of witnesses. Defendant contends that this was error under the circumstances.

Dr. Eaton performed an operation on Mrs. Happel's spine during her third hospitalization at St. Luke's Hospital. Dr. Irwin Schmidt was asked to interpret those records. During the course of his testimony, Dr. Schmidt stated that some of Dr. Eaton's handwritten notations were difficult to read and he was unable, therefore, to determine whether a rectal examination of Mrs. Happel had been ordered by Dr. Eaton. Defendant's position is that Dr. Eaton's testimony became necessary during the course of the trial to explain the unintelligible portions of his handwriting, and why those particular portions were made.

In support thereof, defendant argues that since Northampton County Rule 212(f)(4)[10] was not in

---

10. Rule 212(f)(4) provides that at trial the parties will be limited to those witnesses, exhibits and documents divulged at pretrial unless opposing counsel waives such restrictions or the court finds such limitations to be manifestly unjust.

effect at the time of trial, the learned trial judge had no inherent power to exclude Dr. Eaton's testimony. In the alternative, defendant argues that even if there existed the inherent power to exclude, it was manifestly unjust to do so. We do not agree.

Turning to defendant's first argument herein, it must be pointed out that this is simply an incorrect statement of the law. "The introduction of testimony is peculiarly within the scope of the discretion of the trial judge and will not be disturbed in the absence of an abuse of this discretion": Stack v. Tizer, 204 Pa. Superior Ct. 203, 203 A.2d 403 (1964); Nelson v. Facciola, 197 Pa. Superior Ct. 502, 179 A.2d 258 (1962).

Secondly, a review of the testimony discloses that although Dr. Schmidt was unable to read Dr. Eaton's notations concerning a rectal examination, neither Dr. Schmidt nor Dr. Eugene DiSalvo had any difficulty in utilizing the records to evaluate the effect of Dr. Eaton's operation on Mrs. Happel's coccygeal pain. In our view, the issue of whether Dr. Eaton ordered a rectal examination was a collateral one at best. Furthermore, Dr. Eaton's testimony would have been cumulative in light of the testimony of Dr. Schmidt and Dr. DiSalvo.

Therefore, since " [t] he evidence was merely cumulative . . . it was not error to refuse its admission": Nelson v. Facciola, supra. Further, "the decision of the trial judge as to how far proof of collateral issues will be permitted is conclusive, and will not be interfered with unless the power of the trial judge is manifestly abused": Cartmel v. Williams, 207 Pa. Superior Ct. 144, 215 A.2d 282 (1965).

Under these circumstances, we find that it was not an abuse of discretion to preclude Dr. Eaton's testimony.

## TESTIMONY OF DR. CHARLES IOBST RE NECESSITY OF SUBSEQUENT HOSPITALIZATIONS

During the cross-examination of Dr. Charles Iobst, a surgeon and specialist in psychiatry and neurology who had been treating Mrs. Happel, the learned trial judge permitted Dr. Iobst to testify, over defendant's objection, that hospitalizations at University of Pennsylvania Hospital and St. Luke's Hospital were necessary and related to Mrs. Happel's coccygeal pain. Defendant contends that Dr. Iobst was not qualified to render that opinion, and that his opinion did not specifically meet the criteria of Ratay v. Liu,[11] regarding proof of special medical damages, because he did not testify that the hospitalizations were related to the effects of Dr. Johnson's coccygectomy. We disagree.

In giving his qualifications, Dr. Iobst testified that he was not qualified to render a neurological opinion concerning any part of the body below the chest area. In light of that limitation, the learned trial judge refused to allow Dr. Iobst to express an orthopedic or neurologic interpretation of the surgical procedures involved. Dr. Iobst was permitted to testify that, based on the findings of coccygeal pain contained in the records, the hospitalizations in question were necessary and related to the treatment of Mrs. Happel's continuing pain. As a treating physician with personal knowledge of Mrs. Happel's condition, Dr. Iobst was competent to express that narrowly circumscribed opinion.

## IMPROPER CLOSING ARGUMENT RE CALCULATION OF DAMAGES

In his closing speech to the jury, plaintiffs' counsel

11. 215 Pa. Superior Ct. 547, 260 A. 2d 484 (1969).

offered as guides in determining the amount of damages to be awarded, three separate and specific dollar amounts, to be multiplied by a specified number of times in each instance. Defendant's objections to counsel's statements were overruled and his motion for the withdrawal of a juror denied by the learned trial judge. Because the dollar amounts stated were not in evidence, defendant contends that reversible error was committed: Wilson v. Nelson, 437 Pa. 254, 258 A.2d 657 (1969); Ruby v. Casello, 204 Pa. Superior Ct. 9, 201 A.2d 219 (1964); Stassun v. Chapin, 324 Pa. 125, 188 Atl. 111 (1936); Joyce v. Smith, 269 Pa. 439, 112 Atl. 549 (1921). While we agree with the general principle of law that any suggestion to the jury of an arbitrary amount where unliquidated damages are claimed is improper, we find no prejudicial error under the circumstances of this case.

Defendant's contention overlooks the fact that during the course of counsel's summation he repeatedly told the jury that the amounts stated were not in evidence and that the jury was not bound to accept those amounts in determining damages. Likewise it overlooks the fact that the learned trial judge in his charge instructed the jury as follows:

"Pain and suffering cannot be measured in terms of dollars and cents. There is no yardstick you can use in determining a proper allowance for pain and suffering . . . The rule is that you must use your own good judgment in determining what is a proper allowance, taking into consideration the pain and suffering in the past, what pain and suffering might be expected in the future, and to make an allowance for that." (Charge of the court, pages 47 and 48.)

In Ruby v. Casello, supra, the Superior Court refused to grant a new trial on the basis of improper argument by plaintiff's counsel because the court

immediately warned the jury that a valuation of pain and suffering at $1 per minute was improper. While in the present matter no such immediate instruction was forthcoming, we find that the candor of plaintiffs' counsel in explaining his valuations together with the court's limiting charge, precluded prejudice to defendant.

Accordingly, the court enters the following

## ORDER OF THE COURT EN BANC

And now, to wit, December 26, 1972, defendant's motions for judgment n.o.v. and for a new trial are hereby denied and dismissed.